[Crim. No. 5842. Second Dist., Div. Three. Sept. 3, 1957.]

THE PEOPLE, Respondent, v. RICHARD MARQUIS, Appellant.

Chas. H. Lynch and Stanley T. Tomlinson for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Vern B. Thomas, District Attorney (Santa Barbara), and John G. Barnes, Deputy District Attorney, for Respondent.

VALLÉE, J.—Defendant was charged in an indictment and convicted by a jury of five counts of embezzlement by a public officer, (Pen. Code, § 504) and of 11 counts of making false entries in accounts relating to public moneys. (Pen. Code, § 424, subd. 3.) Defendant was sentenced to state prison on each count, the sentences to run concurrently. He appeals from the judgment.

From August 1951 defendant was city assessor of Santa Barbara. The embezzlement and false entries involve unsecured personal property taxes levied against merchants doing business in the city during the tax years 1955-56 and 1956-57.

*The Counts Charging Embezzlement.*

Count I charged defendant with embezzlement of $33.91, taxes paid by Dan's Radio Den for the tax year 1955-56. Dan's Radio Den was owned and operated by Daniel Foote and his wife. Mrs. Foote testified that on June 29, 1955 defendant came to the store and had a conversation with her in which he told her he had already paid the taxes for Dan's Radio Den and when she got around to paying them she should pay him personally. Thereupon Mrs. Foote wrote a check for $33.91 payable to "Dick Marquis" and gave it to defendant. She knew defendant was the city assessor. Defendant endorsed the check and deposited part of the $33.91 in his bank account and received the balance in cash. The city did not receive any part of the $33.91.

Count II charged defendant with embezzlement of $67.10, taxes paid by El Cielito Restaurant for the year 1955-56. Harry Davis owned and operated the restaurant. He testified a check dated June 11, 1955, payable to "Richard Marquis" in the amount of $67.10 was prepared by his auditor over his signature. He knew defendant was the city assessor and that the check was for taxes. Davis did not recall having had a conversation with defendant in which defendant stated he had paid the taxes and Davis could reimburse him. Defendant testified he took the check and cashed it, intending to replace it later so as to coincide with the entry he had made on a control card in his office. The city did not receive any part of the $67.10.

Count III charged defendant with embezzlement of $31.72, taxes paid by Club 14 for the tax year 1955-56. Count IV charged defendant with embezzlement of $51.14, taxes paid by Figueroa Bowling Alley, for the tax year 1955-56. Kenneth Brooks owned Club 14 and Figueroa Bowling Alley. He testified he issued two checks dated June 3, 1955, for $31.72 and $51.14 payable to "Dick Marquis" and gave them to defendant whom he knew to be the city assessor. He could not remember whether he had a conversation with defendant prior to writing the checks nor could he remember defendant's stating that the tax had been paid and that he could reimburse him. Defendant endorsed the $31.72 check and cashed it at a delicatessen where he was a customer. He endorsed the $51.14 check, applied $29 of it on a loan he had with a finance company, and received $22.14 in cash. The city did not receive any part of the $31.72 or of the $51.14.

Count V charged defendant with embezzlement of $75, taxes paid by Brooks for Club 14, Figueroa Bowling Alley, Figueroa Billiards, and Figueroa Restaurant for the tax year 1956-57. On May 21, 1956, Brooks wrote a check for $75 payable to "Richard Marquis" for taxes. Brooks testified that prior to writing the check defendant stated, "Write me a check for $75.00 and I will take care of your taxes." Defendant endorsed the check, applied part of it on an automobile loan, and received the balance in cash. The city did not receive any part of the $75. Sometime after May 31, 1956, and on a Saturday, the day after his records had been seized, defendant returned to Brooks and asked for his tax bills. Brooks obtained them and when they were totaled the amount was $127.12. Brooks wrote a check for that amount payable to "City Assessor," and at defendant's request dated

the check back to May 31, 1956. Defendant wrote a check payable to Brooks for $75 to reimburse him for the amount previously received. He went to his office and placed the $127.12 check in a basket for processing the following Monday.

■ Defendant first asserts the court erred in refusing to instruct the jury they could find him guilty of any offense the commission of which is necessarily included in that with which he is charged if the evidence supports such a verdict; that the offense of theft by embezzlement of which defendant was charged necessarily includes the crime of obtaining money under false pretenses; and that if the jury found defendant guilty of an offense included within the charge of the indictment but entertained a reasonable doubt as to the degree of the crime of which he was guilty, it was their duty to convict him only of the lesser offense.[1]

Section 504 of the Penal Code provides: "Every officer . . . of any . . . city . . . who fraudulently appropriates to any use or purpose not in the due and lawful execution of his trust, any property which he has in his possession, or under his control by virtue of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of embezzlement."

Section 532 provides: "Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money . . . is punishable in the same manner and to the same extent as for larceny of the money . . . so obtained."

Defendant says he is not guilty of embezzlement but rather guilty of obtaining money by false pretenses; and since the amounts involved are less than $200 he is only guilty of petty theft.

The latest expression of the Supreme Court as to when a lesser offense is "necessarily included in that with which he is

---

[1] "You may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, if, in your judgment, the evidence supports such a verdict under my instructions.

"To enable you to apply the foregoing instruction, if your findings of fact require you to do so, I instruct you that the offense of theft by embezzlement, of which the defendant is charged on counts one, two, three, four and five on the indictment, necessarily includes the crime of obtaining money under false pretenses."

"If you find that the defendant was guilty of an offense included within the charge of the indictment, but entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense."

charged" is *People* v. *Marshall,* 48 Cal.2d 394 [309 P.2d 456]. It was held that a lesser offense is "necessarily included" if it is within the offense specifically charged in the accusatory pleading, even though its elements are not necessarily within those of the statutory definition of the crime. The court said (p. 405):

"Since the decisions as to included offenses, so far as they relate to choice of a standard to measure what offenses are 'necessarily included' within the meaning of section 1159 of the Penal Code, have not expressly considered or decided the question of selection as between the language of the accusatory pleading and the statutory definition, we base our choice of the specific language of the accusatory pleading upon considerations of fairness to both parties."

■ The specific allegations of the accusatory pleading, rather than the statutory definitions of offenses charged, constitute the measuring unit for determining what offenses are included in a charge. The indictment in each of the first five counts charged defendant with embezzlement thus:

"That on or about [date] . . . the crime of violation of Section 504 of the Penal Code of the State of California, embezzlement, a felony, was committed by Richard J. Marquis who was then and there an officer of the City . . . the City Assessor, and who was as such officer the person charged and entrusted by law with the duty of the receipt, safekeeping and transferring of certain public moneys, being personal property taxes collected for and on behalf of the City . . . and then and there and by virtue of his said duty and trust as such officer as aforesaid, there came into the care, possession, custody and control of him the said defendant, the sum of . . . lawful money of the United States, being public moneys and the property of the City . . . being unsecured personal property taxes paid by . . . for the tax year . . . and he the said defendant after said public moneys as aforesaid had come into his care, possession, custody and control as aforesaid, did then and there on or about the [date] at and in the City . . . wilfully, unlawfully, fraudulently and feloniously convert, embezzle and appropriate said public moneys to his own use and to uses and purposes not in the due and lawful execution of the said duties and trust of said defendant as aforesaid, as such officer and trustee and person entrusted therewith, as aforesaid."

■ Applying the yardstick announced in Marshall, it is

evident the court correctly refused to give the proffered instructions. The charge is "in the words of the statute describing the offense." (See Pen. Code, § 952.) A person charged with embezzlement by a public officer "in the words of the statute describing the offense" would not be charged with and could not be properly convicted of obtaining money by false pretenses because the accusatory pleading does not inform the defendant that he must be prepared, at the trial, to contravene evidence that he knowingly and designedly, by false or fraudulent pretense, defrauded another of money and thereby got the money. (*People* v. *Marshall*, 48 Cal.2d 394, 398-399 [309 P.2d 456].) The indictment charged that public moneys came into defendant's possession by virtue of his office, and that after they came into his possession he unlawfully appropriated them to his own use. No element of obtaining money under false pretenses was charged. There was nothing in the indictment informing defendant that he should be prepared to contravene evidence that he knowingly and designedly, by false and fraudulent pretense, defrauded the persons named in Counts I to V of money and thereby got the money.

On facts similar to those in the present case it has been held that the defendant was guilty of embezzlement by a public officer. (*People* v. *Robertson*, 6 Cal.App. 514 [92 P. 498]; *People* v. *Bender*, 132 Cal.App. 753 [23 P.2d 439]; *People* v. *Tennant*, 32 Cal.App.2d 1 [88 P.2d 937].)

Defendant introduced in evidence a letter written to him by the chief administrative officer of the city in which demand was made on him to pay to the city "the sum of $268.58 now due and owing to the City by reason of your having collected certain personal property taxes which have not been turned over to the City Treasurer and Tax Collector." As a consequence of this letter defendant sent a check for $268.58 to the city, which it later returned.

The People proffered this instruction:

"Penal Code Section 513 in part provides:

"Whenever, prior to an information laid before a magistrate, or an indictment found by a grand jury, charging the commission of embezzlement, the person accused voluntarily and actually restores or tenders restoration of the property alleged to have been embezzled, or any part thereof, such fact is not a ground of defense."

The court gave the instruction but modified it by

adding: "but it authorizes the Court to mitigate punishment in its discretion."[2]

Defendant asserts error in the giving of the instruction as modified. It was error. (*People* v. *Smith,* 206 Cal. 235, 237 [273 P. 789]; *People* v. *Knott,* 15 Cal.2d 628, 632 [104 P.2d 33, 128 A.L.R. 1367]. Also see *People* v. *Covey,* 137 Cal.App. 517, 520-523 [30 P.2d 1010].) The instruction is entirely inappropriate and misleading in a case of alleged embezzlement of public funds. ■ In that class of offenses the court has no power to grant probation or mitigate the punishment. (Pen. Code, § 1203.)

■ The question is whether the giving of the instruction has resulted in a miscarriage of justice. We think not. Applying the test stated in *People* v. *Watson,* 46 Cal.2d 818, (p. 836 [299 P.2d 243]): "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error," we are satisfied it is not reasonably probable that a result more favorable to defendant would have been reached had the instruction not been given. The evidence is almost conclusive—it unerringly points to guilt. There is no doubt the jury was justified in concluding defendant was guilty as charged in the embezzlement counts. From an examination of the record we are satisfied the giving of the instruction has not resulted in a miscarriage of justice.

*The Counts of Making False Entries in Accounts.*

The charges in Counts VI through XVI were that on specified dates defendant unlawfully made false entries in an account relating to the receipt, safekeeping, transfer and disbursement of public moneys, to wit, an entry in the personal property tax account of named taxpayers for specified tax years. The evidence showed that the false entries were made on "control cards" kept and used in the assessor's office.

The procedure involving the recording of payments of mer-

[2]The instruction as given reads:

"Penal Code Section 513 in part provides:

"Whenever, prior to an information laid before a magistrate, or an indictment found by a grand jury, charging the commission of embezzlement, the person accused voluntarily and actually restores or tenders restoration of the property alleged to have been embezzled, or any part thereof, such fact is not a ground of defense, but it authorizes the Court to mitigate punishment in its discretion."

chants' unsecured personal property taxes in the assessor's office was as follows: A statement of declaration of personal property was given to each taxpayer with instructions for completion and return to the office. The data furnished by a taxpayer was then posted on that particular taxpayer's personal property return card, referred to as the "unsecured card." This card showed the taxpayer's account had not been paid and the amount due. When the amount of the unsecured personal property tax was determined, and if the taxpayer had not indicated a desire to have the tax included on his secured tax account, a personal property tax statement was given to him. On payment of the tax, appropriate entries were made on that taxpayer's unsecured card: the date of payment, the receipt number, initials or name of the deputy making the collection. From the unsecured card the clerk in charge of the merchant's control file system would post onto the "control card" of that taxpayer the year involved, the total amount of the taxes paid, the date paid, and a breakdown of the assessed valuation into such categories as fixtures and merchandise.

If after bills had been sent out but before payment was made the taxpayer elected to pay his tax on the secured roll rather than on the unsecured, the procedure would be as follows: His unsecured card was taken from the file, the information contained thereon was posted to the secured card and the unsecured card was torn in half and clipped to the secured card. The secured card was turned over to the clerk in charge of the taxpayer's control card, who posted to the control card the description of the land on which the personal property tax was to be secured, the date on which the posting to the secured card was done, the total amount of the assessment, and a breakdown of the assessment into fixtures and merchandise. After this posting to the control card the unsecured card was destroyed. If, at the beginning of the year, the taxpayer was to pay his tax on the secured roll, then all information was entered on the secured card from the control card.

Before the beginning of the next tax year, there was a classification of the control card system for the purpose of determining whether the taxpayer should be sent a declaration form, a bill for payment of unsecured personal property taxes, or notice that the property was to be secured on designated real estate. At that time a notation was made on each control card to indicate this treatment. From the

control cards addressograph plates were sorted into the classifications designated on the control cards.

The control cards were filed alphabetically and were used as a quick and ready reference for data concerning a taxpayer's account. They were used daily in the assessor's office, rather than other cards. As the collection season progressed, they were flagged to indicate such things as unpaid accounts, absence of return of declaration forms, accounts subject to welfare exemptions, accounts for which second notices were to be sent. New addresses and changes in locations of business were first indicated on the control card and thereafter entered on the other records from the control card. Two public accountants who audited the assessor's records for the tax years 1955-56 and 1956-57 testified that the control cards were a key record in the accounts of the assessor, were an integral part of the taxpayer's account, and were necessary to the proper operation of the assessor's office.

Defendant concedes he made false entries on the control cards of the taxpayers specified in Counts VI through XVI. He argues that the control cards are not "accounts" within the meaning of section 424, subdivision 3, of the Penal Code, and therefore the evidence does not support the verdicts as to those counts.

Penal Code, section 424, provides:

"Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safe-keeping, transfer, or disbursement of public moneys, who either:— . . .

"3. Knowingly keeps any false account, or makes any false entry or erasure in any account of or relating to the same; . . .

"Is punishable by imprisonment in the state prison for not less than one nor more than ten years, and is disqualified from holding any office in this state."

The word "account" is a generic term, difficult to define, having various meanings depending on the surrounding circumstances and the connection in which it is used. (1 C.J.S. 571.) Webster gives some thirteen different definitions. (Webster's New Inter. Dict., 2d ed.) One of these is that "account" means "the preparation of a record (or statement) of transactions or the like." Another is "A statement and explanation of one's administration or conduct in money affairs." It may mean a statement or record of financial transactions (*Tuttle* v. *Board of Education,* 77 Utah 270 [294

P. 294, 299]), a reckoning or computation (*John Diebold & Sons Stone Co.* v. *Tatterson,* 115 Va. 766 [80 S.E. 585, 587]), a registry of pecuniary transactions (*In re McLean,* 270 F. 348, 350). The particular mode of keeping the account, whether on book or loose scraps of paper, or without any written charges, or whether it is all kept in one shape or in different forms, is unimportant. (*Millet* v. *Bradbury,* 109 Cal. 170, 173 [41 P. 865].)[3]

■ The control cards are a record of the transactions involving the payment of merchants' personal property taxes. They contain the history of each account represented thereby. From the face of a control card can be determined what tax was paid, when it was paid; the total assessed value; the breakdown of the valuation into merchandise and fixtures; whether the account is secured or unsecured; and what office forms have been prepared or sent to the taxpayer for each year. At the commencement of the next tax year, it is from the control card that the determination is made as to what forms shall be prepared for the current year. There are unsecured cards for only some of the taxpayers because where the personal property of the taxpayer is to be assessed along with the real estate and is to be secured thereby, the unsecured card, after the information is posted to the secured card and to the control card, is destroyed. Two public accountants who audited the records of the assessor's office stated the control cards were an integral part of the taxpayer's account and were necessary to the proper operation of the assessor's office.

In *People* v. *Tomalty,* 14 Cal.App. 224 [111 P. 513], the defendant was charged with making a false entry in a ledger of the treasurer of the City and County of San Francisco in violation of the then sections 113 and 114 of the Penal Code pertaining to making false entries in public records. The treasurer was required to keep accounts of all the different funds in his charge. The statute did not specify what par-

---

[3]At defendant's request the court gave this instruction: "You are instructed that the term 'Account' involves the idea of debit and credit, and the balance of the account is the result of the debit and credit sides of the account, which constitutes a claim for which the party in whose favor it exists has a right of action.

"Webster's New International Dictionary defines account as follows: A reckoning of money transactions, a written or printed statement of business dealings, or debts and credits, or of a certain class of them, or of other things subject to a reckoning or review; hence a right or claim, the items of which make up such a statement."

ticular books of account he should keep. The court said (p. 231):

"In order that an entry or record of the official acts of a public officer shall be a public record it is not necessary that such record be expressly required by law to be kept, but it is sufficient if it be necessary or convenient to the discharge of his official duty. 'Any record required by law to be kept by an officer, or which he keeps as necessary or convenient to the discharge of his official duty, is a public record.' (Cyclopedic Law Dictionary, p. 776.) Accordingly it has been held in Michigan that certain tax sales books, made and kept by the receiver of taxes, are public records, although there was no express statutory provision requiring such books to be kept. (*Burton* v. *Tuite*, 78 Mich. 363 [44 N.W. 282].)" (Also see *People* v. *Shaw*, 17 Cal.2d 778, 811 [112 P.2d 241]; *People* v. *Pearson*, 111 Cal.App.2d 9, 18 [244 P.2d 35].) The false entries made by defendant on the control cards of the taxpayers named in the 11 counts were false entries made in the personal property "account" of each within the meaning of section 424, subdivision 3, of the Penal Code.

In his brief defendant says he appealed from an order denying his motion for a new trial as well as from the judgment. The record shows that there was no appeal from the order denying a new trial and that the appeal was from the judgment only.[4]

The judgment is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

---

[4] The notice of appeal reads: "You WILL PLEASE TAKE NOTICE that Defendant Richard J. Marquis hereby appeals to the District Court of Appeal of the State of California, Second District, from the judgment rendered in the above entitled cause by the Superior Court of the State of California in and for the County of Santa Barbara and entered on the third day of October, 1956, and from the whole of said judgment."