[No. 4199–II. Division Two. December 8, 1981.]

THE STATE OF WASHINGTON, *Respondent*, v. HOWARD
W. FUNKHOUSER, *Appellant*.

618

*Malcolm L. Edwards,* for appellant.

*Jeff Campiche, Prosecuting Attorney for Pacific County,* and *Jeremy Randolph, Special Deputy,* for respondent.

REED, C.J.—Defendant Howard W. Funkhouser appeals his conviction of keeping a false account by a public officer. We reverse.

From 1969 until mid–1978, defendant served as police chief of the City of Raymond. During defendant's tenure the part–time department secretary also served as part–time clerk of the municipal court. Among the principal duties of the court clerk were accepting and keeping records of bail payments and fines. The clerk's desk was located in the police station. Three women successively served as court clerk and police department secretary during this period: Irene Lindberg (1969–73), Kris McFarland (1973–77) (who was married to defendant from 1976 to 1978), and Colene Mason (1977–78). The municipal court judge reportedly was disabled during most of this period and did not effectively supervise the court clerk. Several people testified that defendant responded to this situation by assuming some degree of supervision over the clerks in the performance of their court duties. Defendant denied he asserted any general control over the court clerks but acknowledged he stepped in when McFarland neglected her

duties and helped to get the office in order after Mason succeeded her.

At the time defendant became police chief, fines and other payments were recorded in a "Redi–Form" receipt book. Shortly thereafter, at the urging of the State Auditor's office, the municipal court began to use a "transaction journal" instead of the receipt books. Defendant instructed his officers, however, to continue using the receipt books when accepting fines or other payments in the clerk's absence, thereby creating two sets of books. Defendant explained that because his officers did not understand the new system they frequently made mistakes in the transaction journal. Using the receipt books, he explained, eliminated this problem because the clerk would enter the payments in the transaction journal when she returned to the station. McFarland testified, however, that defendant told her also to use the receipt books.

Beginning in 1971, unexplained cash shortages began to appear in the court's account. Lindberg testified that when she first reported a cash shortage to defendant, he told her he suspected a particular police officer was responsible and instructed her to hold back receipts until the next month to cover the shortage. Lindberg testified that shortages continued and that finally defendant instructed her to write false refund receipts to cover the missing funds. McFarland also testified that defendant instructed her to falsify records to conceal continuing cash shortages. She further testified that defendant told her to place court funds in his office overnight for safekeeping. Mason testified that shortages continued during the time she was turning over court funds to defendant. Defendant denied instructing any of the clerks to falsify records.

In 1978 defendant learned that the State Auditor would be coming to examine the court's books. Defendant asked Mason to determine exactly how much money was currently missing. Upon being informed the account was $2,600 out of balance, defendant obtained a bank loan to generate the needed cash and gave it to Mason to deposit

in the court's account. In the course of his subsequent examination, the auditor discovered that during the previous 6½ years, an estimated $45,000 in cash had been taken from the court's account and that court records reflecting the disposition of those funds had been falsified. Defendant resigned as police chief shortly thereafter.

In November 1978, after granting immunity to Lindberg and McFarland, the State prosecuted defendant on four counts of misappropriating public funds under RCW 42.20-.070(1) and one count of keeping a false account under RCW 42.20.070(2).[1] The jury acquitted defendant of all misappropriation charges but convicted him of keeping a false account. In response to a posttrial motion, the trial court set aside the guilty verdict because the jury instruction on keeping a false account had not contained two essential elements of the crime. In April 1979, after several unsuccessful defense motions for exclusion of evidence or dismissal, defendant was retried on the single charge of keeping a false account. In the second trial, the jury again found defendant guilty. The court sentenced defendant to

---

[1]RCW 42.20.070 reads:

"Misappropriation and falsification of accounts by public officer. Every public officer, and every other person receiving money on behalf or for or on account of the people of the state or of any department of the state government or of any bureau or fund created by law in which the people are directly or indirectly interested, or for or on account of any county, city, town or any school, diking, drainage or irrigation district, who—

"(1) Shall appropriate to his own use or the use of any person not entitled thereto, without authority of law, any money so received by him as such officer or otherwise; or

"(2) Shall knowingly keep any false account, or make any false entry or erasure in any account, of or relating to any money so received by him; or

"(3) Shall fraudulently alter, falsify, conceal, destroy or obliterate any such account; or

"(4) Shall wilfully omit or refuse to pay over to the state, its officer or agent authorized by law to receive the same, or to such county, city, town or such school, diking, drainage or irrigation district or to the proper officer or authority empowered to demand and receive the same, any money received by him as such officer when it is a duty imposed upon him by law to pay over and account for the same, shall be punished by imprisonment in the state penitentiary for not more than fifteen years."

15 years imprisonment. Defendant now appeals that conviction.

Defendant first argues that his retrial for keeping a false account subjected him to double jeopardy because he was formerly acquitted of all charges of misappropriating public funds. His argument is twofold: first, because the State alleged in the information that he committed the crime of keeping a false account to conceal his misappropriation of public funds, proof of the false account charge required proof of an incorporated charge of misappropriation; second, because the State alleged in the information at the initial trial that he ordered court employees to falsify records as part of the "manner and means" of committing the crime of misappropriation, the crime of keeping a false account constituted *attempted* misappropriation, a lesser included offense of misappropriation of which he was acquitted. Defendant thus contends his conviction must be reversed and all charges against him must be dismissed. We disagree.

The briefs in this case seem to indicate that the parties believe the double jeopardy issue turns on whether RCW 42.20.070 defines a single crime that can be committed in more than one way or instead defines multiple crimes carrying the same punishment. *See, e.g., State v. Orsborn,* 28 Wn. App. 111, 626 P.2d 980 (1980). Although this argument presents an intriguing question upon which sharply conflicting authority can be found, we do not believe it is material to the double jeopardy issue presented in this case.

■ In our view, the fact determinative of this issue is that the jury in the first trial found defendant *guilty* of keeping a false account. That conviction was set aside by the trial court only because of unintentional errors in the instructions defining the crime, and defendant was retried on the same charge of keeping a false account. Reversal of a conviction based upon an erroneous instruction is not an acquittal. *State v. Dault,* 25 Wn. App. 568, 608 P.2d 270 (1980). The double jeopardy clause does not bar retrial of a defendant after a tainted conviction is reversed unless the

defendant can show that the taint was a product of deliberate harassment or overreaching. *E.g., United States v. Jorn,* 400 U.S. 470, 483–84, 27 L. Ed. 2d 543, 91 S. Ct. 547 (1971) (plurality opinion); *Ball v. United States,* 163 U.S. 662, 41 L. Ed. 300, 16 S. Ct. 1192 (1895). *See generally* Westen, *The Three Faces of Double Jeopardy: Reflections on Government Appeals of Criminal Sentences,* 78 Mich. L. Rev. 1001 (1980). Defendant has made no such showing here. Thus, regardless of whether RCW 42.20.070 defines a single crime or multiple crimes, the crucial fact in determining whether defendant's retrial was barred by double jeopardy principles is his conviction in the first trial of keeping a false account, not his acquittal of misappropriating public funds. *See State v. Scott,* 64 Wn.2d 992, 395 P.2d 377 (1964).

■ Turning then to defendant's twofold argument, we first reject his contention that proof of the false account charge required proof of misappropriation of public funds. Although the State alleged several acts of misappropriation in the information charging defendant with keeping a false account, the information would remain sufficient to charge a crime under RCW 42.20.070(2) even if the allegations of misappropriation were deleted. *Cf. People v. Sperl,* 54 Cal. App. 3d 640, 654–55, 126 Cal. Rptr. 907, *cert. denied, Sperl v. California,* 429 U.S. 832, 50 L. Ed. 2d 97, 97 S. Ct. 95 (1976) (Cal. Penal Code § 424(3) (West), prohibiting keeping a false account, does not become "inoperative" when there is no misappropriation of funds under section 424(1)). The jury in the second trial was not instructed that the State needed to prove misappropriation to convict defendant as charged. *See State v. Worland,* 20 Wn. App. 559, 582 P.2d 539 (1978). Thus, the allegations of misappropriation were merely surplusage. *State v. Holt,* 52 Wn.2d 195, 198, 324 P.2d 793 (1958).

■■ We likewise reject defendant's contention that keeping a false account constitutes *attempted* misappropriation, thus barring retrial on a false account charge after his acquittal of misappropriation. In support of this argu-

ment, defendant relies upon *State v. Roybal,* 82 Wn.2d 577, 512 P.2d 718 (1973), in which the court indicated that acquittal of an offense is a bar to conviction of the same offense or any lesser included offense in a subsequent trial. *See* RCW 10.43.020, .050; *State v. Peck,* 146 Wash. 101, 261 P. 779 (1927). Defendant's reliance on *Roybal* is misplaced. Keeping a false account is not a lesser included offense of misappropriation of public funds. As the *Roybal* court explained:

> A lesser included offense exists when all of the elements of the lesser offense are necessary elements of the greater offense. Put another way, if it is possible to commit the greater offense without having committed the lesser offense, the latter is not an included crime.

(Citation omitted.) *Roybal,* 82 Wn.2d at 583. *See State v. Rapp,* 25 Wn. App. 63, 604 P.2d 534 (1979). The *Roybal* court also indicated that the test focuses on the *statutory elements* of the two offenses, not on the allegations contained in the formal charges. *Roybal,* 82 Wn.2d at 580–83. Judged by this standard, misappropriation of public funds clearly can be committed without keeping a false record and vice versa. As a plain reading of RCW 42.20.070 reveals, each of the two subdivisions in question requires proof of an element that the other does not.[2] Consequently, we hold that the double jeopardy clause did not bar defendant's retrial for keeping a false account.

Next, defendant submits that if double jeopardy principles did not preclude a second trial altogether, at the least the doctrine of collateral estoppel barred the State's use in

---

[2]Even if keeping a false account were an included offense of misappropriation, the rule barring conviction of an included offense on retrial after acquittal of a greater offense rests on the defendant's interest in avoiding the harassment of successive trials when all the charged crimes could have been joined in a single trial. *See* CrR 4.3(c)(3); *ABA Standards for Criminal Justice,* "Joinder and Severance," Std. 13-2.3 (2d ed. 1980). It should be obvious that the rationale for the rule is inapplicable when, as in the instant case, both offenses are tried together in one initial proceeding and the defendant is convicted of the "lesser included offense." *See State v. Schoel,* 54 Wn.2d 388, 341 P.2d 481 (1959) (remanding for new trial on included offense).

evidence and argument at the second trial of defendant's alleged complicity in misappropriation of public funds. Prior to the second trial, defendant moved on the ground of collateral estoppel to exclude any evidence of misappropriation by him. The trial court denied the motion, ruling that the evidence could be admitted as long as it was more probative than prejudicial. During opening argument the prosecutor, without directly so alleging, clearly implied that defendant had embezzled court funds and argued that he had falsified accounts to conceal those thefts. Defendant moved for a mistrial on the ground that the prosecutor's remarks were improper in view of defendant's former acquittal. The motion was denied. Furthermore, to provide a motive for the falsifications, the State clearly attempted to establish in its case in chief that defendant had appropriated the missing funds to his own use. Several times during closing argument the prosecutor suggested that defendant was responsible for the thefts. In an effort to minimize the effect of this evidence and argument, defendant asked the court to instruct the jury that he had no complicity in the misappropriations.[3] The court refused.

Defendant argues that the foregoing rulings of the court constituted reversible error. Relying primarily on *Ashe v. Swenson,* 397 U.S. 436, 25 L. Ed. 2d 469, 90 S. Ct. 1189 (1970), and *United States v. Mock,* 604 F.2d 341 (5th Cir. 1979), he contends that after he was acquitted of misappropriation in his first trial, collateral estoppel barred the State from arguing or trying to establish for any purpose in a subsequent criminal prosecution that he committed the same offense. Because the State has made no attempt to distinguish between *Ashe* or *Mock,* or to cite contrary authority, it apparently concedes that the collateral estop-

---

[3]Defendant's proposed instruction No. 9 read:

"You are instructed that Howard W. Funkhouser, defendant herein, at no time ever appropriated, or attempted to appropriate, to his own use, or to the use of any person not entitled thereto, without authority of law, any money received for, or on behalf of, the City of Raymond, the Raymond Municipal Court, or the Raymond Police Department."

pel doctrine operates as defendant suggests. The State argues, however, that any trial errors committed in connection with references to misappropriation by defendant were harmless.

We believe that under contemporary interpretations of the collateral estoppel doctrine much of the evidence and argument of which defendant complains was improper. Consequently, we feel obliged to discuss the issue briefly, if for no other reason than to provide guidance to the trial court upon remand. It is unnecessary, however, to resolve this appeal on the basis of collateral estoppel, or to address the State's harmless error argument, because we believe other errors in this case compel reversal.

██ Stated simply, the doctrine of collateral estoppel prevents a second litigation of issues between the same parties, even though a different claim or cause of action is asserted. *Seattle–First Nat'l Bank v. Kawachi,* 91 Wn.2d 223, 588 P.2d 725 (1978).[4] Collateral estoppel has long been recognized as applicable in criminal cases. *Sealfon v. United States,* 332 U.S. 575, 92 L. Ed. 180, 68 S. Ct. 237 (1948); *United States v. Oppenheimer,* 242 U.S. 85, 61 L. Ed. 161, 37 S. Ct. 68 (1916); *United States v. Kramer,* 289 F.2d 909 (2d Cir. 1961); *State v. Peele,* 75 Wn.2d 28, 448 P.2d 923 (1968); *State v. Barton,* 5 Wn.2d 234, 105 P.2d 63 (1940). In *Ashe v. Swenson, supra,* the Supreme Court held that collateral estoppel is embodied in the federal constitutional guaranty against double jeopardy. The court stated at page 443:

> "Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a

---

[4]In Restatement (Second) of Judgments § 68 (Tent. Draft No. 1, 1973), the American Law Institute has offered the following definition of the doctrine:

"When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."

valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Ashe* teaches that in order to decide what issues were determined by a previous general verdict of acquittal, a court first must examine the record of the prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matters; the court then must determine whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. *Id.* at 444. If it could have, the doctrine does not apply.

We are reasonably confident that the issue defendant sought to preclude in his second trial was determined in his favor by the jury in his first trial, even though we have no transcript of the first trial before us. The instructions to the jury called for conviction on the misappropriation charge if defendant had appropriated public funds to his own use or to the use of another or if he had been an accomplice to misappropriation of public funds. The instructions reveal no reasonable basis for the verdict other than that the jury remained unconvinced that defendant had committed those acts. The general verdict of not guilty determined at least those facts in his favor. *See State v. Harris,* 2 Wn. App. 272, 289–91, 469 P.2d 937 (1970), *rev'd,* 78 Wn.2d 894, 480 P.2d 484, *rev'd, Harris v. Washington,* 404 U.S. 55, 30 L. Ed. 2d 212, 92 S. Ct. 183 (1971).

Once this initial question is resolved, however, the effect of the verdict of acquittal on the second prosecution must be determined. Courts now agree that when a factual issue necessary for conviction of a charged crime was decided against the State in a previous prosecution of the same defendant, the collateral estoppel doctrine bars the defendant's conviction of that crime. *Ashe* is an example of such a case. Some courts have concluded that the constitutional collateral estoppel doctrine enunciated in *Ashe* is limited to those situations in which a second prosecution would be barred. *See, e.g., State v. Cooksey,* 499 S.W. 2d 485 (Mo. 1973) (dictum). As explained in *United States v. Keller,*

624 F.2d 1154, 1158 (3d Cir. 1980):

> It might be possible to read *Ashe v. Swenson* as incorporating within the double jeopardy clause only that anti–harassment aspect of collateral estoppel which bars reprosecution since there is a qualitative difference between reprosecution and the broader scope of collateral estoppel as applied to the evidentiary use of prior acquittals in prosecutions involving different offenses. . . . As long as the subsequent prosecution is not precluded by the double jeopardy clause, the anti–harassment function of collateral estoppel may lose much of its relevance since it is the requirement of standing trial which constitutes the forbidden harassment.

(Citation omitted.) Other courts have read *Ashe* much more broadly, concluding that the double jeopardy clause now prohibits the *evidentiary* use of crimes of which the defendant previously was acquitted, regardless of whether reprosecution is barred. *See, e.g., Blackburn v. Cross,* 510 F.2d 1014 (5th Cir. 1975); *Wingate v. Wainwright,* 464 F.2d 209 (5th Cir. 1972).

It is unnecessary for us to take a position in this debate over the meaning of *Ashe* because even if the collateral estoppel doctrine embodied in the double jeopardy clause merely bars reprosecution, we believe that collateral estoppel as an aspect of the law of judgments would still prohibit the State's attempt to relitigate the issue of defendant's misappropriation of public funds. Although the precise issue appears to be one of first impression in Washington,[5]

---

[5]Previous decisions in this state overturning criminal convictions on the basis of collateral estoppel all have involved situations in which a second prosecution for the offense charged was barred altogether. *State v. Hite,* 3 Wn. App. 9, 472 P.2d 600 (1970); *State v. Harris, supra.*

In *State v. Russell,* 62 Wn.2d 635, 637, 384 P.2d 334 (1963), the defendant argued that evidence of tampering with a prosecution witness was inadmissible because of his prior acquittal of that charge. The court rejected that argument, holding that "[t]he fact of acquittal of the criminal offense of which evidence is offered, does not affect its admissibility but goes only to its weight." Although that holding may appear to be inconsistent with the view we express herein, we note that the defendant in *Russell* did not urge reversal on a theory of collateral estoppel but argued instead that in light of his acquittal the evidence in question was more prejudicial than probative under the rules governing admission of other

the law in at least five federal circuits is that collateral estoppel bars *any* use in a subsequent criminal prosecution of evidence necessarily determined in the defendant's favor by a previous verdict of acquittal. *See United States v. Castro*, 629 F.2d 456 (7th Cir. 1980); *United States v. Keller, supra; United States v. Mock, supra; United States v. Mespoulede*, 597 F.2d 329 (2d Cir. 1979); *United States v. Day*, 591 F.2d 861 (D.C. Cir. 1978). Furthermore, a Ninth Circuit panel recently indicated in dictum that it would follow these decisions if squarely faced with the issue. *United States v. Powell*, 632 F.2d 754 (9th Cir. 1980). *But see United States v. Castro–Castro*, 464 F.2d 336 (9th Cir. 1972), *cert. denied*, 410 U.S. 916, 35 L. Ed. 2d 278, 93 S. Ct. 971 (1973). Only two federal circuits seem to follow a contrary rule. *See Oliphant v. Koehler*, 594 F.2d 547 (6th Cir. 1979); *King v. Brewer*, 577 F.2d 435 (8th Cir. 1978), *cert. denied*, 440 U.S. 918, 59 L. Ed. 2d 468, 99 S. Ct. 1238 (1979). An early decision typical of those following the majority rule is *United States v. Kramer, supra.* We find the following reasoning of Judge Friendly in *Kramer* to be persuasive:

> A defendant who has satisfied one jury that he had no responsibility for a crime ought not be forced to convince another of this, even in a prosecution where in theory, although very likely not in fact, the Government need not have tendered the issue. . . . The very nub of collateral estoppel is to extend *res judicata* beyond those cases where the prior judgment is a complete bar. The Government is free, within the limits set by the Fifth Amendment, . . . to charge an acquitted defendant with other crimes claimed to arise from the same or related conduct; but it may not prove the new charge by asserting facts necessarily determined against it on the first trial, no matter how unreasonable the Government may

---

crimes evidence. We believe this fact explains the result reached in *Russell. See United States v. Day*, 591 F.2d 861, 869 n.19 (D.C. Cir. 1978); *Wingate v. Wainwright*, 464 F.2d at 213 n.3; *State v. McKenzie*, 292 N.C. 170, 232 S.E.2d 424 (1977). For similar reasons, we see no inconsistency between our disposition of this case and our recent decision in *State v. Tarman*, 27 Wn. App. 645, 621 P.2d 737 (1980).

consider that determination to be.

(Footnote and citations omitted.) *Kramer*, 289 F.2d at 915–16. *See Wingate*, 464 F.2d at 213–14.

Accordingly, it appears that some of the evidence and argument used to convict defendant of keeping a false account should have been excluded. If the State chooses to retry defendant on this charge following our remand, the trial court must exclude all evidence which, if believed, would necessarily show defendant's complicity, either as principal or accomplice in the misappropriation of public funds. *Kramer*, 289 F.2d at 921.

Next, defendant argues that the trial court committed reversible error by giving, over his objection, an instruction defining "knowledge" based on the language of RCW 9A.08.010(1)(b)(ii). The statute under which defendant was convicted required that he "*knowingly* keep any false account, or make any false entry or erasure in any account". (Italics ours.) RCW 42.20.070(2). He contends the instruction was erroneous for two reasons: (1) it applied a provision of the new criminal code, RCW Title 9A, to conduct occurring prior to the effective date of the new code; and (2) it either directed the jury to presume culpable knowledge on his part or permitted the jury to find guilt on the basis of mere recklessness or negligence. We believe both contentions have merit and warrant reversal of defendant's conviction and the granting of a new trial.

■ Addressing defendant's first contention, we note that the instructions given allowed the jury to convict defendant for any one of several acts he allegedly committed between January 1, 1972 and July 15, 1978. Although the definition of "knowledge" contained in RCW 9A.08-.010(1)(b) governs the interpretation of the word "knowingly" in RCW 42.20.070(2), *see* RCW 9A.04.090, the legislature explicitly made the provisions of the new code inapplicable to acts committed prior to July 1, 1976. RCW 9A.04.010(3). Moreover, the "knowledge" instruction given in this case would have been defective under prior law. *See*

*State v. Tembruell,* 50 Wn.2d 456, 312 P.2d 809 (1957); *State v. Rubenstein,* 69 Wash. 38, 124 P. 135 (1912). Accordingly, it was error to instruct the jury to apply the new code's "knowledge" definition in evaluating the criminality of acts occurring before July 1, 1976.

 Defendant's second objection to the instruction provided the basis of the Supreme Court's holding in *State v. Shipp,* 93 Wn.2d 510, 610 P.2d 1322 (1980). The court reasoned that an instruction framed in the language of RCW 9A.08.010(1)(b) is subject to three possible interpretations, two of which are unconstitutional. The court held that RCW 9A.08.010(1)(b), constitutionally interpreted,

> merely allows the inference that a defendant has knowledge in situations where a reasonable person would have knowledge, rather than creating a mandatory presumption that the defendant has such knowledge.

*Shipp,* 93 Wn.2d at 512. Accordingly, the court held that if a jury might have found a defendant lacked subjective knowledge of a material fact, yet convicted him because it believed an ordinary person would have known, the defendant is denied due process of law. Because the knowledge instruction in this case was virtually identical to the one in *Shipp,* it was error to give the instruction.

The State acknowledges that *Shipp* seems to render the instruction given in this case erroneous but nevertheless argues that *Shipp* does not require reversal of defendant's conviction because defendant admitted that he intentionally deposited personal funds in a public account. According to the State, this conduct constitutes the making of a false entry within the meaning of RCW 42.20.070(2). Because there was thus undisputed proof of criminal conduct, the State argues that any error associated with the "knowledge" instruction was harmless. We do not find this argument persuasive.

Because the error is of constitutional stature, a reviewing court must be able to say it was harmless error beyond a reasonable doubt to uphold the conviction. *State v. Matthews,* 28 Wn. App. 198, 204, 624 P.2d 720 (1981). Where

the jury *must* have found that a defendant had actual knowledge, the conviction will not be disturbed. *State v. Russell,* 27 Wn. App. 309, 312, 617 P.2d 467 (1980); *State v. Ticeson,* 26 Wn. App. 876, 878, 614 P.2d 245 (1980). *But see State v. Simmons,* 28 Wn. App. 243, 246, 622 P.2d 866 (1980) (there must be evidence upon which the jury could have found defendant acted recklessly, negligently, or out of naive ignorance before the giving of the erroneous instruction constitutes reversible error). The State correctly points out that in *State v. Hinz,* 93 Wn.2d 510, 610 P.2d 1322 (1980), one of the companion cases to *Shipp,* the court held that the inclusion of a similar definition of knowledge in the jury instructions was harmless error. The court reached that conclusion, however, because accompanying instructions defined the crime in such a way that to convict Hinz the jury *necessarily* had to have found he acted intentionally. *Shipp,* 93 Wn.2d at 517–18.

In the instant case, we cannot conclude the error was harmless. First, although the jury may have convicted defendant solely on the basis of his admitted deposit of personal funds in the court's account, it is equally possible the jury convicted him for any one of numerous other acts, allegedly committed in concert with the clerks, which were more clearly culpable but of which defendant denied any knowledge. We have no way of knowing what the jury decided because the verdict was general in form. *See State v. Matthews,* 28 Wn. App. at 207 (Reed, C.J., concurring specially). Second, even if we were to assume that the jury based defendant's conviction solely on the $2,600 deposit, that assumption would avail the State of nothing because, as explained in our discussion of the next assignment of error, we conclude that as a matter of law the evidence submitted in regard to that transaction did not make out a violation of RCW 42.20.070(2) by defendant.

As an additional ground for reversal, defendant argues that a deposit of personal funds into a public account with-

out a false entry does not violate RCW 42.20.070(2).[6] As noted above, defendant admitted that in 1978 he gave Mason $2,600 in cash to deposit in the court's account to make up a shortage before it could be discovered by the State Auditor. Mason deposited the money in the bank along with the usual deposit slip, which accurately reflected the date and amount of the deposit but did not reflect the source of the funds.[7] The prosecutor argued to the jury that the deposit itself constituted the keeping of a false account under RCW 42.20.070(2).[8] The State adheres to that theory on appeal. The trial court refused to give a proposed defense instruction informing the jury that the failure to reflect the source of the funds on the deposit slip did not violate RCW 42.20.070. Defendant argues that this refusal constituted error. Under the circumstances of this case, we agree.

RCW 42.20.070 was enacted in its present form in 1909 as a section of this state's former criminal code. Laws of

---

[6]We address this issue not only to demonstrate that the error in giving the knowledge instruction was prejudicial, but also because the issue likely will arise again if defendant is retried following our remand of this case.

[7]Other deposit slips recording legitimate deposits in the court's account likewise failed to record the source of the funds.

[8]For example, in his opening statement, the prosecutor told the jury:

"*The defendant used three separate systems to accomplish that cover–up by falsifying the records.* As a result, the city officials, the mayor, the city clerk, the state officers, the auditors, and the public were not aware of the thefts during this period of time.

"The three methods of falsification of the records or concealing the fact that the money is missing are as follows: . . .

". . .

"The third method employed to conceal shortages of money was to deposit large sums of cash equaling a shortage whenever the state auditor arrived to do an audit. In other words, if you're $2000 short of cash and the auditor is there, cover it up by taking $2000 of your own money and putting it in and nobody will know there is a cash shortage, *falsify the books in that manner.*

"The defendant admits using this former method, or this last method to cover up a shortage of over $3000 concerning a period of time when the defendant had ordered his employees to deliver money received by the court to him for safe keeping and then to deposit it in a bank." (Italics ours.)

1909, ch. 249, § 317. The legislature modeled the code largely after those of Minnesota and New York, each of which contained a section virtually identical to RCW 42.20.070. Laws of 1909, ch. 249, p. 890. *See* Minn. Stat. § 620.01 (repealed 1963); N.Y. Penal Law § 1865 (McKinney 1909) (repealed 1965). The crucial phrases in RCW 42.20-.070(2) for purposes of this assignment of error are "keep any false account" and "make any false entry." There is no statutory definition of either phrase, nor is there a reported Washington appellate decision construing RCW 42.20-.070(2).

In determining whether defendant's act of depositing his own funds into the court's account without indicating their source violated the provisions of the statute, we must bear in mind the well established principle that penal statutes are to be strictly construed so that only conduct which is clearly and manifestly within the statutory terms is subject to punitive sanctions. *State v. Cann,* 92 Wn.2d 193, 595 P.2d 912 (1979). Even though conduct may be within the reason of a statute and the mischief to be remedied thereby, it cannot be punished as a crime unless so denominated by the statute. *State v. Hoffman,* 110 Wash. 82, 188 P. 25 (1920). Strict construction requires that doubts as to the meaning of an ambiguous penal statute must be resolved against including borderline conduct. *State v. Sullivan,* 28 Wn. App. 29, 621 P.2d 212 (1980); *State v. Lundell,* 7 Wn. App. 779, 503 P.2d 774 (1972).

These principles of statutory construction lead us to conclude that defendant's deposit of personal funds in the court's account without revealing their source did not violate RCW 42.20.070(2). First, contrary to the State's position, the mere deposit itself did not violate the statute, even though it may have served to misrepresent the actual status of the court's account. It did not constitute an "entry" within the meaning of the provision prohibiting the making of any false entry. "Entry" in this context is defined as "[t]he act of making or entering a record; a setting down in writing of particulars; or that which is entered;

an item." Black's Law Dictionary 627 (4th rev. ed. 1968).[9] The word is generally synonymous with "recording." *Id.* In commercial law, "entry" denotes the act of a merchant, trader, or other businessman in recording in his account books the facts and circumstances of a sale, loan, or other transaction or refers to the note or record so made. *Id. See Lewis v. United States,* 22 F.2d 760, 764 (8th Cir. 1927); 1 Bouvier's Law Dictionary 1044 (3d rev. ed. 1914). The false entry provision of the statute is directly concerned only with the accurate *recording* of a transaction, not with the propriety of the transaction itself. Nor do we believe the deposit violated the provision prohibiting the keeping of any false account. "Account" is defined as "[a] statement in writing, of debts and credits, . . . with their respective dates." Black's Law Dictionary, at 34. *See People v. Marquis,* 153 Cal. App. 2d 553, 315 P.2d 57 (1957); *State v. Rouzer,* 127 W. Va. 392, 32 S.E.2d 865 (1945). "Keep" as used in this statute means "[t]o maintain continuously and methodically for the purposes of a record; as, to 'keep' books." Black's Law Dictionary, at 1006. Thus, to "keep any false account" means to maintain a false record of transactions. As is true of the false entry provision, the false account provision does not address the propriety of the underlying transaction but merely attempts to ensure its accurate recording. Consequently, we conclude that defendant did not violate RCW 42.20.070(2) by depositing personal funds in the court's account. *Accord, People v. Baranello,* 24 A.D.2d 637, 262 N.Y.S.2d 382 (1965) (construing former N.Y. Penal Law § 1865).

Whether the failure to indicate the source of the funds on the deposit slip violated the same provisions presents a closer question, but we conclude it did not because the entry was not "false" within the meaning of the statute.

---

[9]Unambiguous words in a statute that are not defined therein should be given their ordinary meaning, which may be determined by reference to extrinsic aids such as dictionaries. *Garrison v. State Nursing Bd.,* 87 Wn.2d 195, 550 P.2d 7 (1976).

The word "false" is defined variously in *Webster's Third New International Dictionary* 819 (1969) as "not corresponding to the truth or reality: not true: ERRONEOUS, INCORRECT" and as "being other than what is purported or apparent: assumed or designed to deceive: not genuine or real: COUNTERFEIT, ARTIFICIAL, SHAM, FORGED, SPECIOUS". The deposit slip was literally true since it accurately recorded the date and amount of the deposit and contained no erroneous or incorrect notations. On the other hand, the deposit slip clearly was "designed to deceive" in that anyone examining the slip would assume that it recorded a deposit of court funds in the bank. These alternative possible interpretations of the word "false" create an ambiguity in the statute that in our view must be resolved in favor of the defendant.

Cases from other jurisdictions support our conclusion that the failure to indicate the source of the funds did not make the entry false.[10] A federal statute prohibits the making of any false entry in any book, report, or statement of a national bank. 18 U.S.C.A. § 1005. Numerous federal cases have addressed the question of what constitutes a "false entry" under that statute. A fair reading of the holdings of those cases is that entries recording fictitious transactions or inaccurately recording actual transactions are false, but entries recording actual transactions exactly as they occurred are not false even though the transactions are part of a fraudulent or otherwise illegal scheme. *See, e.g., Coffin v. United States*, 162 U.S. 664, 683–84, 40 L. Ed. 1109, 16

---

[10]In the absence of Washington precedent in point, we may look for guidance to decisions of other jurisdictions construing identical or similar statutes. If a state statute relates to the same subject matter as a federal act, the interpretations of the federal act may be used to assist in interpreting the state statute. *Albertson's, Inc. v. State Human Rights Comm'n*, 14 Wn. App. 697, 544 P.2d 98 (1976). Decisions construing the federal act, while not controlling, generally are persuasive authority. *See State ex rel. Washington Fed'n of State Employees, AFL–CIO v. Board of Trustees*, 93 Wn.2d 60, 605 P.2d 1252 (1980). Likewise, judicial interpretations of statutes in other states are entitled to consideration in construing a similar statute enacted by our legislature. *See* 2A C. Sands, *Statutory Construction* § 52.02 (4th ed. 1973).

S. Ct. 943 (1895); *United States v. Erickson*, 601 F.2d 296, 302 (7th Cir. 1979).[11] Courts in other states also generally have adopted a narrow interpretation of the term "false entry" in similar statutes. *See, e.g., State v. Heron*, 94 Ariz. 81, 381 P.2d 764 (1963) (deposit of funds made to create false picture of financial condition of bank; truthful entry of fraudulent transaction does not constitute false entry); *Adams v. State*, 179 Ark. 1047, 20 S.W.2d 130 (1929) (entry representing transaction as it actually existed is not false entry). In summary, we conclude that nothing defendant did in connection with depositing his own funds into the court's account violated RCW 42.20.070(2).

In view of our disposition of this case, we need not address the remaining issues raised by defendant. The judgment is reversed and the cause is remanded for retrial.

PEARSON and PETRICH, JJ., concur.

Reconsideration denied January 5, 1982.

---

[11]The great majority of federal cases construing 18 U.S.C.A. § 1005 are consistent with our conclusions on this issue. *See, e.g., United States v. Erickson, supra* (entries recording purchase of securities at inflated prices; failure to disclose difference between purchase prices and market prices did not constitute violation of statute); *United States v. Manderson*, 511 F.2d 179 (5th Cir. 1975) (entry not false merely because underlying transaction is illegal); *Laws v. United States*, 66 F.2d 870 (10th Cir. 1933) (entry in books which reflects actual transaction as it occurred is not false, even if transaction was unauthorized); *United States v. Herrig*, 204 F. 124 (D. Mont. 1913) (failure to fill in blank not false entry even if calculated to deceive); *United States v. Young*, 128 F. 111 (M.D. Ala. 1904) (not false entry to record on books of bank check known to be worthless and fraudulent even though entry made with intent to deceive). *But see United States v. Krepps*, 605 F.2d 101, 109 (3d Cir. 1979) (entry may be false by virtue of omission of material information as much as by actual misstatement); *United States v. Harter*, 116 F.2d 51, 57 (7th Cir. 1940) (if normal meaning of entry is such that it represents facts to exist which are inconsistent with existence of fraudulent transaction which is subject of entry, then entry is false).