[No. 29915-1-II.   Division Two.   August 31, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. BRIAN EGGLESTON, *Appellant.*

420

*Sheryl G. McCloud*, for appellant.

*Gerald A. Horne*, *Prosecuting Attorney*, and *John M. Sheeran*, *Deputy*, for respondent.

¶1 ARMSTRONG, J. — Brian Eggleston appeals his convictions of second degree murder and first degree assault following shootings that occurred during the execution of a search warrant at his residence on October 16, 1995. We affirm the convictions but vacate Eggleston's sentences and remand for resentencing.

## FACTS

¶2 In August 1995, Pierce County Deputy Sheriff Ben Benson began investigating Eggleston's marijuana dealing based on information he received from Steve McQueen. McQueen said that Eggleston's brother was a deputy sheriff and was present during one buy at Eggleston's house. Benson confirmed that Deputy Sheriff Brent Eggleston shared his brother's address.

¶3 Benson then arranged for McQueen to buy marijuana from Eggleston. In early October 1995, McQueen bought marijuana from Eggleston twice. On October 9, Benson obtained a warrant to search Eggleston's home. He decided to serve the warrant early on October 16, before Eggleston was fully awake and before children arrived at the elementary school across the street from the Eggleston residence.

¶4 The entry team included deputies John Bananola, Warren Dogeagle, Jeff Reigle, John Reding, Cynthia Fajardo, Martin Kapsh, and Bruce Larson. Benson was to provide perimeter surveillance. The team wore marked jackets that identified them as sheriff deputies. Bananola wore a reflective vest that had four inch letters stating "Sheriff" on the front and back. He also had long hair and facial hair because of his undercover work. Reding wore a vest with "Sheriff" on the front and back, a helmet with a face shield, and black pants. Dogeagle wore a hooded mask because he was working undercover on a case involving heroin dealers in the same neighborhood. He also wore a

cap with a sheriff's insignia and a green raid jacket with "Sheriff" on the front and back. Fajardo wore a black uniform that said "Narcotics" and her name on the front, and Reigle wore a green raid jacket with "Sheriff" on the front and back.

¶5 The deputies entered the unlocked back door of the residence using the knock and announce procedure. Reding went in first and saw Thomas Eggleston, Eggleston's father, on the couch in the living room. Bananola followed and turned down a hallway. As Reigle prepared to follow Bananola, gunfire erupted. Reigle saw Bananola heading toward the front door of the residence in a low position. Reigle then saw Linda Eggleston open a door into the kitchen and look at him. He heard Thomas Eggleston tell her to put the gun down.

¶6 While covering Thomas Eggleston in the living room, Reding heard the shots and turned to see Bananola coming from the hallway in an upright position and then start to stumble. Reding retreated toward the back door and saw Eggleston move toward the living room with a gun in his hands. Reding fired three shots at him.

¶7 As the deputies withdrew, Dogeagle heard Bananola say, "Put the gun down. Police." Report of Proceedings at 4419-21. Dogeagle was still in the kitchen when Eggleston came through a door and started shooting at him. Dogeagle returned fire and Eggleston fell backward.

¶8 Reding returned to the van to retrieve a ballistic shield and entered the house with the other deputies behind him. They saw Bananola lying face down on the living room floor. He had been shot seven times, with three shots to the head and shots to the shoulder, arm, chest, and foot. Eggleston suffered five gunshot wounds, including wounds to his chest, lower right side, abdomen, groin and knee. Eggleston recovered; Bananola died.

¶9 In addition to evidence of the shootings, Tacoma police officers found drugs, drug paraphernalia, and cash in Eggleston's bedroom.

¶10 The State charged Eggleston by amended information with aggravated murder in the first degree, alleging that he knew or should have known that Bananola was a law enforcement officer performing his duties at the time of his death; assault in the first degree based on his shooting at Dogeagle and/or Reding; unlawful delivery of a controlled substance (marijuana) on October 7, 1995; unlawful possession of a controlled substance with intent to deliver (marijuana) on October 16, 1995; unlawful delivery of a controlled substance (marijuana) on October 5, 1995; and unlawful possession of a controlled substance (mescaline) on October 16, 1995. Several of these counts included sentence enhancements.

¶11 These charges resulted in three trials. The first jury returned guilty verdicts on all counts except count I, murder in the first degree. The jury hung on the murder count and the court declared a mistrial. The trial judge sentenced Eggleston on the five counts for which he had been convicted.

¶12 The State tried Eggleston again on the first degree murder charge, and the jury found him guilty of the lesser included offense of murder in the second degree. The court had explicitly instructed that if the jury found Eggleston guilty of murder in the first degree, it was to fill out two special verdict forms: one on the aggravating factor (whether he knew or reasonably should have known that Bananola was an officer) and another on the weapons enhancement (whether he used a deadly weapon). In contrast, if the jury found Eggleston guilty of murder in the second degree, it was to fill out only the weapons enhancement special verdict form. Despite its acquittal of the first degree murder charge, the jury answered "no" to the aggravating circumstance special verdict. Clerk's Papers (CP) at 1495.

¶13 Further, the aggravating factor special verdict form expressly stated:

We, the jury, *having found the defendant guilty of Murder in the First Degree*, make the following answer to the question submitted by the court:

Question: Has the State proven the existence of the following aggravating circumstance beyond a reasonable doubt?

That Deputy John Bananola was a law enforcement officer who was performing his official duties at the time of the act resulting in death and that Deputy John Bananola was known or reasonably should have been known by the defendant to be such at the time of the killing.

Answer: No.

CP at 1495 (emphasis added).

¶14 On appeal, we reversed Eggleston's murder and assault convictions but affirmed his drug convictions. *State v. Eggleston*, noted at 108 Wn. App. 1011, 2001 WL 1077846, 2001 Wash. App. LEXIS 2125. We found error in the aggressor and provocation instructions; we also found juror misconduct in the second trial and error in certain evidentiary rulings.

¶15 At Eggleston's third trial, the State's reconstruction expert, Rod Englert, opined that Eggleston fired into Bananola's head as Bananola lay on the living room floor. The defense reconstruction expert, Kay Sweeney, opined that Eggleston was in the hallway when he fired at and killed Bananola. In December 2002, the jury again convicted Eggleston of second degree murder and first degree assault.

¶16 In this appeal, Eggleston argues that the second jury's verdict and answer to the special verdict barred the State from presenting evidence in his third trial that he knew Bananola was a police officer or that he premeditated the murder. He also questions the self-defense instructions, various evidence rulings, the dismissal of three jurors, jury misconduct, resentencing on his drug convictions, and his exceptional sentence.

## ANALYSIS

COLLATERAL ESTOPPEL

¶17 Eggleston argues that the collateral estoppel component of the double jeopardy clause precluded the State from introducing evidence that he knew Bananola was an officer performing official duties because previous juries acquitted him of first degree murder and the aggravating factor after being presented with that evidence.[1]

A. Collateral Estoppel as a Component of Double Jeopardy Clause

¶18 The United States and Washington Constitutions' double jeopardy clauses are "identical in thought, substance, and purpose." *State v. Schoel*, 54 Wn.2d 388, 391, 341 P.2d 481 (1959); *see* WASH. CONST. art. I, § 9; U.S. CONST. amend. V. They both " 'protect against multiple punishments for the same offense, as well as against a subsequent prosecution for the same offense after acquittal or conviction.' " *State v. Graham*, 153 Wn.2d 400, 404, 103 P.3d 1238 (2005) (quoting *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004)). Where the language of the state constitution is similar to that of the federal constitution, we give the same interpretation to the state constitutional provision as the United States Supreme Court has given the federal constitution. *State v. Linton*, 122 Wn. App. 73, 76, 93 P.3d 183 (2004) (citing *Schoel*, 54 Wn.2d at 391), *review granted*, 153 Wn.2d 1017 (2005).

¶19 The doctrine of collateral estoppel is embodied in the constitutional guaranty against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 442-43, 90 S. Ct. 1189, 25 L.

---

[1] At the first and second trials, the State argued that Eggleston knew the officers were police officers and, therefore, fired to protect his drug operations. Because Eggleston's argument that the drug evidence should have been barred by collateral estoppel is inextricably linked to his argument that evidence of knowledge should have been excluded as well, our discussion of evidence of knowledge necessarily includes the drug evidence. Thus, we do not discuss it separately.

Ed. 2d 469 (1970). Collateral estoppel means that when an issue of ultimate fact has once been determined by a "valid and final judgment," that issue cannot be litigated again between the same parties in any future lawsuit. *Ashe*, 397 U.S. at 443. But it does not always bar the later use of evidence simply because it relates to alleged criminal conduct for which a defendant has been acquitted. *See Dowling v. United States*, 493 U.S. 342, 350, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990).

¶20 Collateral estoppel in criminal cases is "not to be applied with [a] hypertechnical and archaic approach . . . but with realism and rationality." *Ashe*, 397 U.S. at 444. It exists where " 'a fact necessarily determined in the defendant's favor by his earlier acquittal [makes] his conviction on the challenged second trial . . . impossible unless the fact could be relitigated and determined adversely to the defendant.' " *United States v. James*, 109 F.3d 597, 601 (9th Cir. 1997) (alteration in original) (quoting *Pettaway v. Plummer*, 943 F.2d 1041, 1046 (9th Cir. 1991), *overruled on other grounds by Santamaria v. Horsley*, 133 F.3d 1242, 1245, 138 F.3d 1280 (9th Cir. 1998)); *United States v. Head*, 697 F.2d 1200, 1205 (4th Cir. 1982). In contrast, " 'double jeopardy guarantees are not engaged by collateral estoppel which, if applied, would merely restrict proof but not make conviction impossible.' " *James*, 109 F.3d at 601 (quoting *Pettaway*, 943 F.2d at 1046). The preclusive effect of a jury's verdict is a question of law that we review de novo. *See State v. Johnson*, 128 Wn.2d 431, 443, 909 P.2d 293 (1996) (stating that we review issues of law de novo).

¶21 The State argues that Eggleston must satisfy the collateral estoppel test as laid out in *State v. Tili*, 148 Wn.2d 350, 361, 60 P.3d 1192 (2003). There, the court cited a collateral estoppel test in which the court held that each of the following questions must be answered affirmatively before a court applies collateral estoppel:

(1) Was the issue decided in the prior adjudication identical with the one presented in the action in question? (2) Was there a final judgment on the merits? (3) Was the party against whom

the plea of collateral estoppel is asserted a party or in privity with the party to the prior adjudication? (4) Will the application of the doctrine not work an injustice on the party against whom the doctrine is to be applied?

*Tili*, 148 Wn.2d at 361 (citing *Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983)).

¶22 Only factor (1) is at issue here, whether the third jury necessarily decided the same issue the second jury decided. Because Eggleston analyzes the issue within the framework of federal law and we have found no Washington case on point, we resolve the question on the basis of the federal cases.

## B.  Relitigating Ultimate Facts

¶23 After a jury determines an issue by its verdict, the State cannot "constitutionally hale [a defendant] before a new jury to litigate that issue again." *Ashe*, 397 U.S. at 446. In *Ashe v. Swenson*, three or four armed and masked men robbed six men who were playing poker. *Ashe*, 397 U.S. at 437. The State charged Ashe with the robbery of one of the victims. *Ashe*, 397 U.S. at 438. At trial, the judge instructed the jury that if it found that Ashe was one of the participants in the robbery, he was guilty even if he had not personally robbed the victim. *Ashe*, 397 U.S. at 439.

¶24 A jury acquitted Ashe, and the State then charged and convicted him of robbing another one of the previously named victims. *Ashe*, 397 U.S. at 439. Applying collateral estoppel, the Supreme Court reversed, holding that Ashe's acquittal in the first trial foreclosed the second trial because the acquittal verdict could have meant only that the jury was unable to conclude beyond a reasonable doubt that Ashe was one of the bandits. *Ashe*, 397 U.S. at 445. And to convict at the second trial, the jury would have had to reach a conclusion "directly contrary" to the first jury's decision. *Dowling*, 493 U.S. at 348 (citing *Ashe*, 397 U.S. at 445).

¶25 The Supreme Court limited *Ashe* in *Dowling* where it held that acquittal in a criminal case does not preclude the prosecution from offering evidence from the acquittal

trial in a later action if the ultimate fact issues are not the same and the government does not have to prove beyond a reasonable doubt in the second trial the very issue it failed to prove beyond a reasonable doubt in the first trial. *Dowling*, 493 U.S. at 348-49. Furthermore, evidence tending to prove an issue is admissible when an acquittal on a criminal charge in an earlier proceeding did not necessarily represent a jury determination of that issue. *See Dowling*, 493 U.S. at 350.

¶26 A jury convicted Dowling of robbing a bank while wearing a ski mask and carrying a pistol after the government introduced testimony from a woman who claimed that Dowling, similarly masked and armed, was one of two intruders who entered her home two weeks after the bank robbery—even though Dowling had previously been acquitted of the charges in that case. *Dowling*, 493 U.S. at 344-45. The government relied on Federal Rule of Evidence 404(b), which provides that evidence of other crimes, wrongs, or acts may be admissible against a defendant for purposes other than character evidence. *See Dowling*, 493 U.S. at 345. It used the woman's testimony to strengthen its identification of Dowling as the bank robber and to link him to another person implicated in the bank robbery. *Dowling*, 493 U.S. at 345.

¶27 The Supreme Court held that admitting the woman's testimony did not violate the collateral estoppel component of the double jeopardy clause because the prior acquittal did not determine an issue of ultimate fact actually decided in the bank robbery case. *Dowling*, 493 U.S. at 348. While Dowling's previous acquittal established that there was a "reasonable doubt" as to whether he was the masked man who entered the woman's house, in the context of the robbery trial, the government did not have to prove that he was one of the intruders beyond a reasonable doubt. *Dowling*, 493 U.S. at 348. The Court reasoned that because a jury might reasonably conclude that Dowling was the man who entered the woman's home, even if it did not believe beyond a reasonable doubt that he committed the

crimes charged at the first trial, the collateral estoppel component of the double jeopardy clause was inapposite.[2] *Dowling*, 493 U.S. at 349.

¶28 Later, in *Santamaria v. Horsely*, the Ninth Circuit clarified that "collateral estoppel does not 'exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence.'" *Santamaria v. Horsley*, 133 F.3d 1242, 1247, 138 F.3d 1280 (9th Cir. 1998) (quoting *Dowling*, 493 U.S. at 348). In that case, a jury found a defendant guilty of murder and robbery but found "not true" a sentence enhancement charge that he personally used a knife in the commission of a felony. *See Santamaria*, 133 F.3d at 1244.

¶29 A state appellate court reversed Santamaria's murder conviction, and on remand, the trial court granted Santamaria's motion to preclude evidence that he personally used the knife during the killing. *See Santamaria*, 133 F.3d at 1244. The trial court agreed with Santamaria that the collateral estoppel component of the double jeopardy clause barred evidence that he used a knife because a jury had already decided that issue in his favor in the first trial. *Santamaria*, 133 F.3d at 1244.

¶30 But the Ninth Circuit held that the first jury could have grounded its verdict on an issue other than that which Santamaria sought to foreclose from consideration in the second trial. *Santamaria*, 133 F.3d at 1246. Specifically, even though Santamaria had been acquitted of using a

---

[2] Eggleston cites to *State v. Funkhouser*, 30 Wn. App. 617, 637 P.2d 974 (1981), a case from this court, for the opposite premise. Currently, no court, state or federal, has commented on *Funkhouser*. In *Funkhouser*, we held that retrial for keeping a false account after acquittal of charges of misappropriating public funds did not subject a defendant to double jeopardy because keeping a false account is not a lesser included offense to misappropriation of public funds. *Funkhouser*, 30 Wn. App. at 623-24. This rule comports with the current cases. But we also held that if the State chose to retry the defendant on the false account charge following remand, the trial court must exclude all evidence which, if believed, would necessarily show defendant's complicity, either as principal or accomplice, in the misappropriation of public funds. *Funkhouser*, 30 Wn. App. at 630. This rule conflicts with the *Dowling* rule. Indeed, *Funkhouser* precedes *Dowling*, and the *Funkhouser* court supports its ruling with federal circuit cases. Thus, the *Funkhouser* case, while not overturned by any court, is arguably no longer accurate law as to this issue.

knife, the State was not required to prove beyond a reasonable doubt that he used a knife to obtain a conviction for murder under California law. *Santamaria*, 133 F.3d at 1247. Thus, whether he used a knife was not relitigated under the same standard at the retrial, and the State could not be precluded from presenting otherwise admissible evidence that he stabbed the victim. *Santamaria*, 133 F.3d at 1247.[3]

¶31 Eggleston argues that because in the second trial the State offered evidence that he knew Bananola was a police officer in order to prove premeditation and the second jury acquitted him of premeditated first degree murder, the third trial court should have precluded the State from using evidence that he knew Bananola was a police officer.[4] He also points out that the second jury specifically rejected the aggravating factor by answering "no" to the special verdict question of whether the State had proved that Eggleston knew Bananola was a police officer. Eggleston reasons that because of these decisions, the State improperly relitigated the aggravating factor at the third trial, citing *Pettaway v. Plummer*, 943 F.2d 1041 (9th Cir. 1991).

¶32 In *Pettaway*, the jury convicted the defendant of murder and attempted murder but found in a special verdict that he had not personally shot the deceased. *Pettaway*, 943 F.2d at 1043. The Court of Appeals reversed the murder conviction. *Pettaway*, 943 F.2d at 1043. On remand, Pettaway moved to preclude the State from prosecuting him on the theory that he personally fired the fatal shot. *Pettaway*, 943 F.2d at 1043. The trial judge granted the motion. *Pettaway*, 943 F.2d at 1043. The Ninth Circuit

---

[3] *Santamaria* also relied on *United States v. Watts*, 519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997), in which the Supreme Court stated that " 'an acquittal is not a finding of any fact. An acquittal can only be an acknowledgement that the government failed to prove an essential element of the offense beyond a reasonable doubt.' " *Santamaria*,133 F.3d at 1246 (quoting *Watts*, 519 U.S. at 155).

[4] He complains that the State offered evidence that Bananola was wearing a vest marked "SHERIFF" across the chest and shouting loudly; that Eggleston was a drug dealer who would want to protect his reputation and drugs; that Eggleston had meager work earnings; and that Eggleston shot Bananola at close range and through the letters H and R on Bananola's vest.

upheld that ruling, holding that the first jury necessarily decided that Pettaway did not personally shoot the victim and that the State could not prosecute him on a theory that would require the second jury to decide that he did shoot the victim. *Pettaway*, 943 F.2d at 1046. But the Ninth Circuit reversed *Pettaway* in *Santamaria*, explaining that although the ultimate fact of whether the State had proved the weapon use beyond a reasonable doubt for the weapons enhancement had been determined, that determination did not necessarily mean that the jury had found Pettaway guilty of murder only as an aider and abetter. *Santamaria*, 133 F.3d at 1245-46. Similarly, *Pettaway* does not prevent the State from offering evidence that Eggleston intended to kill Bananola because he was a police officer.

### 1. The Effect of the Second Jury's Acquittal of First Degree Murder

¶33 In the second trial, the State offered evidence that Eggleston knew Bananola was a police officer in order to prove premeditation. But the State did not have to prove that Eggleston knew Bananola was a police officer to establish premeditation. Premeditated killing is an intentional killing where the defendant, however briefly, considers the consequences of his acts. *See State v. Brooks*, 97 Wn.2d 873, 876, 651 P.2d 217 (1982) (explaining that the verb "premeditate" encompasses the mental process of thinking beforehand for a period of time, deliberation, reflection, weighing, or reasoning for a period of time, however short); *but see* RCW 9A.32.020(1) (the premeditation required in order to support a conviction of the crime of first degree murder must involve more than a moment in point of time).

¶34 Unlike in *Ashe* where the jury necessarily decided that Ashe was not one of the participants in the robbery, the jury in Eggleston's second trial could have found that Eggleston did not know that Bananola was a police officer and still convicted him of premeditated, intentional killing. Conversely, it could have found that he knew Bananola was

a police officer and intentionally killed him without the time or opportunity to premeditate. Thus, the second jury's first degree murder acquittal does not alone mean the jury necessarily decided whether Eggleston knew Bananola was a police officer.

¶35 Nor did the third jury necessarily decide whether Eggleston knew Bananola was a police officer. In the third trial, the State charged Eggleston with second degree murder. A person commits second degree murder when "with *intent to cause the death* of another person but *without premeditation*, he or she causes the death of such person unless the killing is justifiable." CP at 774 (emphasis added); *cf*. RCW 9A.32.050. Again, the third jury could have decided that Eggleston intentionally killed Bananola without knowing whether he was a police officer or an intruder. Regardless, under cases like *Dowling* and *Santamaria*, the State was not barred from using evidence that was relevant to showing premeditation for first degree murder, including evidence that he knew Bananola was an officer if it was also relevant and admissible to showing intent for second degree murder.

2. The Effect of the Second Jury's Answer on the Special Verdict Form

¶36 Although the court instructed the second jury to answer the special verdict only if it convicted Eggleston of first degree murder, the second jury answered the special verdict after acquitting Eggleston of first degree murder. Specifically, the jury found that the State had not proved beyond a reasonable doubt that Eggleston knew Bananola was a police officer. The question is whether the jury's gratuitous answer is a decision on an issue of ultimate fact that bars a later jury from considering the same ultimate fact.[5]

---

[5] Even a clearly erroneous acquittal bars retrial. *Fong Foo v. United States*, 369 U.S. 141, 143, 82 S. Ct. 671, 7 L. Ed. 2d 629 (1962) (holding that in criminal cases, even an erroneous acquittal prevents a retrial); *Dunn v. United States*, 284 U.S.

¶37 Here, the second jury's answer is a bar only if it answered an issue of ultimate fact necessary to a valid and final judgment. *See James*, 109 F.3d at 601; *cf. Ashe*, 397 U.S. at 443 (discussing issues of ultimate fact determined by valid and final judgment). In *Ashe*, the jury rendered general verdicts. In considering whether the first jury decided the same issue as the second jury, the Court had to determine whether the first jury actually decided the issue to reach its verdict. *Ashe*, 397 U.S. at 445; *see also Dowling*, 493 U.S. at 348. As part of this inquiry, the Court asked whether the issue in the first trial was an issue of ultimate fact that the jury had to resolve to reach a general verdict of "guilty" or "not guilty." *See Ashe*, 397 U.S. at 443; *see also Dowling*, 493 U.S. at 348.

¶38 While the *Ashe* Court may have formulated this test solely to determine which issues the first jury actually decided, the Ninth Circuit has reiterated that the collateral estoppel rule is limited to questions "necessarily decided" in the first case. *Cf. United States v. Hernandez*, 572 F.2d 218, 220 (9th Cir. 1978); *United States v. Schwartz*, 785 F.2d 673, 681 (9th Cir. 1986); *James*, 109 F.3d at 600. In other words, an initial jury's response to a question it does not legally have to decide does not preclude a later jury from considering the same issue.[6] Here, the second jury did not legally have to decide the aggravating factor. In fact, it did so in violation of the court's instructions. Arguably then, the second jury's answer to the special verdict question was not a decision on an issue of ultimate fact that precluded the third jury from considering the same issue.

---

390, 394, 52 S. Ct. 189, 76 L. Ed. 356 (1932), *overruled on other grounds by Sealfon v. United States*, 332 U.S. 575, 68 S. Ct. 237, 92 L. Ed. 180 (1948).

[6] Unless present charges were "issues of ultimate fact or elements essential to conviction that were 'necessarily decided' " in a previous case, the doctrine of collateral estoppel neither bars the charges nor precludes the government from litigating those issues. *See United States v. Martinez*, 785 F.2d 663, 667 (9th Cir. 1986) (quoting *United States v. Hernandez*, 572 F.2d 218, 220 (9th Cir. 1978)); *see also United States v. McCoy*, 721 F.2d 473, 475 (4th Cir. 1983) (stating that an "acquittal can only be explained as the resolution favorably to the accused of a necessary element of proof of the second charge").

¶39 Even if the jury's answer on the aggravating factor was a binding decision on an issue of ultimate fact, Eggleston has not shown that the third jury decided the same issue differently. The third jury found that Eggleston intentionally shot and killed Bananola. It could have reached this decision without deciding whether he knew Bananola was a police officer. Eggleston may have intentionally shot Bananola, knowing that he was a police officer, to avoid arrest and prosecution. Or he could have shot Bananola, believing him to be an intruder, to protect his stash of drugs. Nothing in the third jury's verdict tells us that the third jury necessarily decided the special verdict question differently than the second jury.

¶40 Under *Dowling* and *Santamaria*, the State was entitled to show in Eggleston's third trial that he intended to kill Bananola because Bananola was a police officer. And although the State used the same evidence in attempting to prove premeditation at the second trial, Eggleston's knowledge of Bananola's official status was not an ultimate fact the State had to prove in order to convict Eggleston of either first or second degree murder. Thus, the State could use the same evidence in the third trial to prove Eggleston's intent.[7]

### 3. Self-Defense Instructions

¶41 Eggleston argues that the trial court erred when it instructed the jury that if he knew or should have known that Bananola was a police officer, he could use deadly force to defend himself only if he was in actual and imminent danger of death or great bodily harm. Under this instruction, Eggleston could not rely on a reasonable belief that he

---

[7] Eggleston attempts to distinguish *Dowling* by asserting that premeditation concerns mens rea and not evidence of prior crimes under ER 404(b). But the *Dowling* rule is not limited to evidence admitted under ER 404(b). "[C]ollateral estoppel does not 'exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence.'" *Santamaria*, 133 F.3d at 1247 (citing *Dowling*, 493 U.S. at 348). As the *Santamaria* court noted, if relevant and probative evidence is not used to prove an issue of ultimate fact that was already decided in a prior trial, collateral estoppel will not preclude the government from introducing that evidence. *Santamaria*, 133 F.3d at 1247.

was in danger; he had to be in actual danger to justify the use of deadly force. Again, he argues that the second jury decided that the State failed to prove he knew Bananola was a police officer and that the challenged instructions erroneously allowed the third jury to decide the same issue differently.

¶42 Eggleston's self-defense theory was that he thought the deputies were thugs who were threatening his life and his family and that he was entitled to use deadly force in self-defense. He maintained that he used reasonable force under the circumstances.[8] The State's rebuttal theory was that Eggleston had no right to use any force against the deputies who entered his house because he knew they were law enforcement officers and because they used lawful force in performance of a lawful duty—serving a search warrant.

¶43 Accordingly, the court gave the jury two alternative instructions on self-defense. Instruction 13 explained that homicide is justifiable when it is committed in the lawful defense of the slayer, and

(1) *the slayer did not know that the person slain was a law enforcement officer*;

(2) the slayer reasonably believed that the person slain intended to commit a felony or to inflict death or great personal injury;

(3) the slayer reasonably believed that there was imminent danger of such harm being accomplished. . . .

CP at 777 (emphasis added).

¶44 Instruction 14 explained that homicide is justifiable when,

(1) *the slayer knew that the person slain was a law enforcement officer*;

. . . .

---

[8] Eggleston argued that the evidence showed that he and his family were asleep when the deputies entered the house and that when they heard noises, Eggleston grabbed his gun and went into the doorway of his bedroom to defend himself and his parents.

(3) the slayer was in actual and imminent danger of death or great bodily harm. . . .

CP at 778 (emphasis added).

¶45 Eggleston has the burden of showing that the second and third juries decided the same issue differently to establish a collateral estoppel/double jeopardy violation. *See James*, 109 F.3d at 601. But because the jury returned a general verdict on second degree murder in the third trial, we do not know which self-defense theory the State overcame. The third jury may have agreed with the second jury that the State had not proved that Eggleston knew Bananola was a police officer. Even so, the third jury could have easily believed that Eggleston executed Bananola with two shots to the head after Bananola was down and seriously disabled. If so, the jury could have concluded that Eggleston faced neither actual nor apparent harm when he killed Bananola. Again, Eggleston has failed to show that the third jury decided the same issue of ultimate fact differently than the second jury.

¶46 Moreover, Eggleston did not challenge the self-defense instructions on this basis at the trial court, nor did he make any claim of error based on collateral estoppel. Generally, we will not address a new issue on appeal unless the defendant can demonstrate that it involves a manifest error affecting a constitutional right. RAP 2.5(a)(3); *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). Under RAP 2.5(a)(3), a defendant must show how an alleged constitutional error actually affected his rights at trial. *See McFarland*, 127 Wn.2d at 334. It is this showing of actual prejudice that makes the error "manifest." *McFarland*, 127 Wn.2d at 333 (citing *State v. Scott*, 110 Wn.2d 682, 688, 757 P.2d 492 (1988)). A "manifest" error is "unmistakable, evident or indisputable, as distinct from obscure, hidden or concealed." *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992). If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest. *McFarland*, 127 Wn.2d at 333 (citing *State v. Riley*, 121

Wn.2d 22, 31, 846 P.2d 1365 (1993)). "An appellant who claims manifest constitutional error must show that the outcome likely would have been different, but for the error." *State v. Jones*, 117 Wn. App. 221, 232, 70 P.3d 171 (2003).

¶47 Eggleston has not shown that the third jury's verdict was the result of any alleged error in the self-defense instructions. A reasonable jury could have concluded that Eggleston was not acting in self-defense, regardless of whether he knew Bananola was an officer. The State presented evidence that Eggleston shot Bananola in the head while he lay disabled on the floor. If the jury accepted this, it could reasonably find that Bananola posed neither an actual nor apparent threat of harm to Eggleston. Accordingly, Eggleston has not shown that he was actually prejudiced by instruction 14 or the admission of evidence that he knew Bananola was an officer; therefore, he has not demonstrated manifest constitutional error.

¶48 We affirm the murder conviction, vacate the exceptional sentence on the murder conviction, and remand for resentencing in accordance with *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). We affirm the assault sentence and vacate the sentences on the drug crimes; and we reinstate the first court's sentences for those convictions.

¶49 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON and BRIDGEWATER, JJ., concur.