[Crim. No. 1007.   Fourth Dist.   Jan. 21, 1955.]

## THE PEOPLE, Respondent, v. JERRY POPE, Appellant.

Alfred J. Hennessy for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

BARNARD, P. J.—The defendant was charged with murder in that on January 24, 1954, he wilfully, unlawfully, feloniously and with malice aforethought, killed and murdered Helen Pixley Pope. A jury found him guilty of murder in the first degree, fixing his punishment at life imprisonment. He has appealed from the judgment and from an order denying his motion for a new trial.

It is first contended that the evidence was insufficient to support a verdict of murder of the first degree, or of any unlawful homicide other than manslaughter.

The defendant married Helen Pixley in Tijuana, Mexico, on July 27, 1953. Shortly after the marriage he claims to have discovered that she did not have a final decree of divorce from her former husband, Pixley, and that she had lived for some months with a sailor named Zobel. She corresponded regularly with Zobel, who was at sea, and refused the defendant's request to advise Zobel that she was married. He testified that he left her twice during the marriage because of her conduct with other men, and that they then made up and he went back with her. The second of these occasions was on September 23, 1953, when she had gone out with a man named "Bob" and returned about 3 a. m. She told him that it was none of his business where she had been, and he beat her severely. Two nights later she went to where he was staying to take him some of his clothes. At that time, in the presence of a witness, he struck her and told her he was going to kill her one of these days if he had to go to

the gas chamber for it. Sometime in October he said to another witness, "Don't you think I did a good job beating the 'old lady' up?" The witness replied in effect, "You knew what she was" and the defendant responded that what she did before was her own business, and that if she did it again he was going to kill her and then kill himself. During December, he told another witness on several occasions that he was going to "beat the hell out of her." On January 12, he told a witness that it looked like things were going to be in a mess as Pixley and Zobel were coming back and that "If she gets out of line I'll kill her and kill myself."

On January 24, 1954, the boat on which Zobel was stationed returned to San Diego, and Zobel and his friend Schimming went ashore together about 11:15 a. m. Zobel immediately called Mrs. Pope and then met her at a "cafe." They then went to another "cafe" where Helen went inside. She came out with the defendant and they both got in the car. The defendant then asked Helen, "What is the score, what are we going to do?" She replied: "I can't take any more, I'm through." The defendant then got out of the car and Helen and the two sailors drove off. They proceeded to her home, arriving there about 2:30 or 3 p. m. At about 3:30 p. m. the defendant had a conversation with a waitress at another "cafe," in which he told her that his wife was going to dinner with Zobel; that he wanted to go out to the house and get some of his things; and that he hoped he would not find his wife there because if he saw her he would kill her. He asked to borrow this witness' automobile but instead of allowing him to do so she asked a Mr. and Mrs. Stultz, who were present, if they would drive him out to his home and they did so.

When they reached the home the defendant went in first, and Stultz parked the car. He testified that when he and his wife entered the house the two sailors were there; that the defendant and his wife were standing near the door of their bedroom; that the defendant asked his wife to have the sailors leave; that she replied, "If they leave, I leave"; that the defendant said, "I am getting tired of your whoring"; that she replied, "Well, I am through with you anyhow, you bastard"; that the defendant asked her if she would talk to him privately and they went into the bedroom; that they returned in about two minutes; that as they came out of the bedroom door the defendant said, "You are either going to get rid of these men or I will kill all of you"; that the defendant then said: "If you leave with them I'll shoot you";

that she replied, "Shoot. You haven't got the guts, you son-of-a-bitch"; that the firing then started; and that the shots were fired in such rapid succession that the witness did not know how many shots were fired.

Schimming's testimony was to the same effect with respect to the shooting, with immaterial variations in detail. Zobel testified that when the defendant entered the house he told the witness and Schimming that he wanted them to leave; that he replied, "All right, we will leave"; that as they were about to leave the defendant and his wife started arguing and went into the bedroom; that she came out and they were arguing; that he saw a gun in the defendant's hand; and that Mrs. Pope said something to the defendant and he started shooting. Mrs. Stultz testified that she went immediately to the bathroom when she entered the house, that when she came out she saw the defendant and his wife in the doorway and saw the flash of the pistol, and that she heard none of the conversation between them. Both Schimming and Zobel testified that when the defendant stopped shooting he dropped the gun and reached for a .22 rifle; that they "jumped him" and took the rifle away from him; and that Zobel called the police while Schimming held the defendant.

The gun was an automatic .22-caliber pistol. A police officer, an expert on firearms, testified that he made tests with this gun, that "it takes $3\frac{1}{2}$ pounds squeeze or weight to fire the gun"; that the gun is not fully automatic; that the trigger has to be released with every shot fired, whereupon the gun would kick out the empty shell and reload itself; that 10 or 11 bullets could be put in the gun at once; and that he did not believe he could fire nine shots in four seconds. A doctor testified that there were 14 bullet holes in the body of the deceased and that some of the bullets had made more than one hole. Nine empty shells were found on the floor of the room where the shooting occurred. A deputy sheriff testified that he arrived at the house at about 4 p. m. on that day; that he found a .22 automatic pistol which was empty and a .22 rifle which was loaded; that the defendant told him that he had shot her, that he did not mean to do it, and that he had started pulling the trigger and could not stop. The officer further testified that later, in the automobile, the defendant stated that he had asked the sailors to leave; that he and his wife had had some words; that he reached up and got the .22 automatic and started shooting; that his wife told him he didn't have the guts to shoot; and that he knew he was guilty and would get the gas chamber.

The defendant testified that he was taken to the house by Mr. and Mrs. Stultz; that when he opened the door Zobel was just coming out of the bedroom; that when he went into the bedroom his wife was pulling her dress on; that when he asked her not to go out with Zobel she said she was going out with him alone; that she also said she was through and called him a "bastard"; that "I reached back and got the gun" intending to scare the two sailors out of the house; that "It is rather vague to me what happened after that"; that the first thing that he could clearly remember was the gun going off in his hand; that "I knew Helen was hit"; and that the only thing he could think of was to get the rifle and kill himself.

The appellant argues that the evidence clearly indicates that this killing was done during a sudden quarrel and in the heat of passion; that there was no time for premeditation; and that the killing occurred as the result of provocation which would naturally arouse the passions of an ordinarily reasonable person and cause him to act rashly without reflection or deliberation. ■ Whether or not the appellant acted without malice during a sudden quarrel and in the heat of passion and whether or not the evidence disclosed premeditation were factual questions for the jury. ■ The evidence, with the inferences that might reasonably be drawn therefrom, was sufficient to support the verdict rendered. The basic cause of defendant's anger was a matter of long standing and the quarrel had continued at intervals through most of that day; the applying of opprobrious epithets by each to the other was nothing new, and the threats to kill were obviously based upon other matters which had been long continued; and about 15 minutes elapsed between the time the appellant entered the house and the time when the shooting began. It could reasonably be inferred that he had made up his mind to kill her, and then kill himself. The facts in this case are distinguishable from those in *People* v. *Kelley,* 208 Cal. 387 [281 P. 609], *People* v. *Holt,* 25 Cal. 2d 59 [153 P.2d 21], and *People* v. *Thomas,* 25 Cal.2d 880 [156 P.2d 7], which are relied upon by the appellant. It cannot be held, as a matter of law, that the required elements to establish murder in the first degree were not sufficiently established by the evidence. (*People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911].)

■ It is next contended that the trial judge committed reversible error in telling the jury that "Thoughts may follow

each other with great rapidity and a cold, calculated judgment and decision may be arrived at quickly." This statement was a part of a long instruction which reads:

"To constitute murder of the first degree in this case, the killing must have been a willful act, accompanied by malice together with a clear and deliberate intent to take life. That intent must have been the result of deliberation and must have been formed on preexisting reflection and not under heat of passion or such other condition as to preclude deliberation. The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. Thoughts may follow each other with great rapidity and a cold, calculated judgment and decision may be arrived at quickly. However, the express requirement for a concurrence of deliberation and premeditation excludes from murder of the first degree those homicides not specifically enumerated in the statutes. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death.

"The adjective 'deliberate' means 'formed, arrived at, or determined as a result of careful thought and weighing of considerations; as a deliberate judgment or plan; carried on coolly and steadily, according to a preconceived design; given to weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; unhurried; characterized by reflection; dispassionate; not rash.' The word 'deliberate' is an antonym of 'hasty, impetuous, rash, impulsive.'

"The verb 'premeditate' means 'to think on, and revolve in the mind beforehand; to contrive and design previously.'

"Thus to find the defendant guilty of murder in the first degree, you must be satisfied beyond a reasonable doubt and to a moral certainty that the unlawful killing was accompanied with a deliberate and clear intention to take life. The intent to kill must be the result of deliberate premeditation; it must be formed upon a preexisting reflection, and not upon a sudden heat of passion sufficient to preclude the idea of deliberation. It is necessary that the act of killing

be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer.''

Most of that instruction, including the language complained of, is identical with the instructions quoted and approved in the case of *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911], which the court held were sufficient to satisfy the requirements of the law with respect to the matter of deliberation and premeditation. When taken in connection with the other language of the instruction the words complained of are neither erroneous nor prejudicial.

█ Finally, it is contended that the court committed prejudicial error in permitting the admission of evidence with regard to the quarrel between the appellant and the deceased in September, 1953; in permitting the district attorney to ask the appellant, on cross-examination, whether his wife had strong sexual urges, and whether he was able to satisfy her; and in permitting the district attorney, in his opening argument, to describe ''malice and the elements of the terms willful, deliberate and premeditate to the disadvantage of appellant.'' No objection to these matters was made, and the first two matters were more or less material on the issues of intent and motive. In the light of the record as a whole no prejudice or reversible error appears. No attempt is made to point out anything wrong in the district attorney's comments on the meaning of malice and other terms involved in the charge, and we find neither error nor prejudice in that connection.

The judgment and order are affirmed.

Griffin, J., and Mussell, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 16, 1955.