[Crim. No. 6335. In Bank. Feb. 6, 1959.]

THE PEOPLE, Respondent, v. JOHN DEWBERRY,
Appellant.

Gladstein, Andersen, Leonard & Sibbett, George R. Andersen and Norman Leonard for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and John S. McInerny, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant appeals from a judgment of conviction entered on a jury verdict finding him guilty of second degree murder and of a violation of section 12021 of

the Penal Code (possession of a pistol by an ex-convict). He also appeals from the order denying his motion for a new trial. He contends that the evidence is insufficient to support the verdict and that the refusal to give certain requested instructions was prejudicial error.

The circumstances of the homicide were related at the trial by two witnesses, Jesse Mosley and defendant. Mosley testified that about 7:30 a.m. on Sunday, October 14, 1956, he went to a bar in San Francisco. He sat near the door and consumed two bourbon highballs. He had been in the bar about 45 minutes when defendant entered and sat about 10 feet from him. Mosley did not know defendant, but had seen him before and had heard his name. Defendant went to the telephone several times and complained about not being able to reach his sister.

In the course of a conversation about gambling between defendant and another customer defendant took a large roll of bills from his pocket. The two agreed to gamble and defendant stated that he did not want any foolishness about his money and that he carried his own protection. He then showed the revolver he was carrying. Defendant repocketed the pistol and the two left the bar. A short time later, defendant returned.

The deceased, Rudolf Glover, entered the bar at about 9 a.m. with a woman whom he introduced as his wife to Mosley and the others. Glover and defendant each bought a round of drinks for the six or seven other customers.

About 10:45 a.m. the television set was turned on for a Forty-Niner football game. Mosley moved to a booth in the rear to see better. About this time defendant told the bartender he wished to take care of his bill and spread his roll of money on the bar.

A few minutes later, two people sat in front of Mosley and blocked his view of the screen, so he started back to his original seat. As he was walking toward the front of the bar he heard defendant accuse Glover of taking his money and demand its return. Glover stated that he was not taking defendant's money but merely keeping it for him to protect him. Defendant told Glover that he did not need his protection, that he had his own protection. Both defendant and Glover were standing, about three bar stools or 10 feet apart. Defendant again demanded that Glover return the money.

In the course of the argument, Mosley saw Glover put his hand in his pocket and pass something to Mrs. Glover. De-

fendant then told Mrs. Glover to put his money on the bar and repeated his demand to Glover. Thereupon defendant took out his revolver, cocked it, and fired once. Glover turned and fell. At no time did Mosley hear Glover threaten defendant or see him make a move toward defendant.

Defendant turned Glover over and went through his pockets. Mrs. Glover began to cry as she put her head on Glover's chest. She then started for the door, but defendant asked her for the rest of his money. When she failed to give it to him, he hit her in the face, knocking her down. He pointed the pistol at her and said, ''If you don't give me my money I will kill you too.'' Mosley took the money from Mrs. Glover. Defendant had the bartender count it for him and when he was told the amount he stated that he was still about $100 short.

Meanwhile, someone had called an ambulance and the police. Officer Dobleman testified that when he arrived at the bar, defendant handed him a .38 caliber revolver with five live rounds and one discharged shell in the cylinder. Defendant told the officer, ''He tried to take my money and I did it.'' Shortly thereafter defendant made substantially the same statement to Inspector McDonald of the homicide detail. It appeared to the officers that at the time he was questioned defendant had been drinking but was in full control of his faculties and had no trouble speaking.

Defendant testified that he was a professional gambler and a car salesman and admitted two prior felony convictions. He had spent the previous night drinking and gambling in San Mateo, had met a friend in San Francisco about 5 a.m., had a few more drinks, and went to the bar about 8 a.m. He was waiting there to get in touch with his sister to give her money for the care of his mother. While he was waiting, he talked to another customer about gambling, but he denied showing him the pistol. He went upstairs and gambled with him for about 45 minutes and won $55.

When he returned to the bar, he had a brief conversation with the bartender about his bar bill. He paid it and then spread his money out along the bar so that he could arrange it according to denomination. He knew he had $1,252. While he was sorting and arranging the money, Mrs. Glover told him to take it off the bar. Defendant told her to mind her own business and she walked away. Glover then walked to the bar and picked up the money. Defendant stopped him and asked him to return it. Glover put some money back on the bar, but

defendant could see that five $100 bills were missing. At defendant's request, the bartender counted the money and found about $700. After defendant's repeated demands for the return of his money, Glover reached in his pocket and raised his arm toward defendant. Glover had told defendant that if he did not shut up he would lose more than his money. One James McCoy had told him that the deceased had a reputation of being belligerent. Defendant said he tried to fire the pistol to the right of Glover, but with no intention to hit him. He had won the weapon in the game in San Mateo and was not sure it was loaded until he pulled the trigger. He denied threatening Mrs. Glover.

The testimony of the autopsy surgeon tended to corroborate defendant's story about Glover's raising his arm toward defendant. James McCoy, called by the People in rebuttal, denied telling defendant anything about Glover.

■ There is no merit in defendant's contention that the evidence was insufficient to support the conviction of second-degree murder. Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187.) Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. (Pen. Code, § 188.) The jury could reasonably conclude from the testimony of the prosecution's eyewitness that defendant shot the deceased without the provocation necessary to make the homicide manslaughter or the deliberation and premeditation necessary to make it first-degree murder. Defendant's testimony of provocation served only to create a conflict in the evidence. (*People* v. *Wein*, 50 Cal.2d 383, 398-399 [326 P.2d 457]; *People* v. *Brust*, 47 Cal.2d 776, 783 [306 P.2d 480]; *People* v. *Pope*, 130 Cal.App.2d 321, 325 [279 P.2d 108].)

■ Defendant contends that the court erred in refusing to give the following instruction:

"The fact that a witness had been convicted of a felony, if such be a fact, may be considered by you for only one purpose, namely, in judging the credibility of that witness. The fact of such a conviction does not necessarily destroy or impair the witness's credibility, and it does not raise a presumption that the witness has testified falsely. It is simply one of the circumstances that you are to take into consideration in weighing the testimony of such a witness."

The jury was instructed that it was for them alone to judge the credibility of the witnesses and the weight to be given the evidence offered; that every person is presumed to speak the truth; and that a witness may be impeached by inconsistent statements, by contradictory evidence, or by evidence that he has been convicted of a felony. These instructions correctly stated the law. Moreover, under the circumstances of the present case, the requested instruction was incorrect. Defendant's convictions were not in the evidence "for only one purpose, namely, in judging the credibility of that witness." They were an essential element in the charged violation of the Deadly Weapons Act. (Pen. Code, § 12021.)

Defendant's most serious contention is that the court erred in refusing to give the following instruction:

"You may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, if, in your judgment, the evidence supports such a verdict under my instructions.

"To enable you to apply the foregoing instruction, if your findings of fact require you to do so, I instruct you that the offense of murder, of which the defendant is charged in Count I of the indictment, necessarily includes the crime of manslaughter.

"If you find that defendant was guilty of an offense included within the charge of the indictment, but entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense." (CALJIC [1946 ed.] Instructions Nos. 115-115A.) The jury was instructed on the elements of the crimes of murder and manslaughter. The court explained that there are two degrees of murder and that if the jurors were convinced beyond a reasonable doubt that defendant had committed the crime of murder but entertained a reasonable doubt as to the degree, they should give defendant the benefit of the doubt and find him guilty of second degree murder. The jury was also instructed that if they were in doubt as to whether the killing was manslaughter or justifiable homicide, defendant was to be acquitted. Finally, the court instructed the jury that defendant was presumed innocent of any crime until the contrary had been proved, and in case of reasonable doubt, was entitled to an acquittal, and that the presumption of innocence attaches at every stage of the case and to every fact essential to a conviction.

Defendant contends that because the instructions on manslaughter were not accompanied with the further instruction that in the case of a reasonable doubt as between second degree murder and manslaughter, defendant was to be found guilty of manslaughter, the jury was given the impression that the rule requiring a finding of guilt of the lesser offense applied only as between degrees of murder.

It has been consistently held in this state since 1880 that when the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the jury must be instructed that if they entertain a reasonable doubt as to which offense has been committed, they must find the defendant guilty only of the lesser offense. (*People* v. *Iams,* 57 Cal. 115, 121, 130; *People* v. *Newcomer,* 118 Cal. 263, 270-271 [50 P. 405]; *People* v. *Marshall,* 120 Cal. 70, 70-71 [52 P. 129]; *People* v. *Burns,* 88 Cal.App.2d 867, 871-873 [200 P.2d 134]; see also *McAffee* v. *United States,* 105 F.2d 21, 31 [70 App.D.C. 142]; *People* v. *Marquis,* 153 Cal.App.2d 553, 556-558 [315 P.2d 57]; *People* v. *Miller,* 67 Cal.App. 674, 678-679 [228 P. 68]; 20 A.L.R. 1258, 1259; 26 Am.Jur., Homicide, § 541.) The People contend, however, that this rule is inconsistent with section 1097 of the Penal Code, which provides that ''Where it appears that the defendant has committed a public offense, and there is reasonable ground of doubt of which of two or more degrees he is guilty, he can be convicted of the lowest of such degrees only.'' They contend that this section is limited on its face to degrees of the same offense and that the proposed instruction is therefore erroneous because murder and manslaughter are distinct offenses.

Section 1097 presupposes that the jury has concluded that the defendant is guilty of some public offense embraced within the pleadings but is in doubt as to the degree of the offense proved. The question presented is whether the words ''offense'' and ''degrees'' refer only to the specifically defined degrees of a single offense, or refer to all the degrees of criminality that may be involved in a criminal act. Thus, an unlawful killing may involve not only the two degrees of murder, but also the included offense of manslaughter. There is no reason for not applying the general principle of reasonable doubt to both situations. Given the overriding basic principle of reasonable doubt, the admonition that the Penal Code is to be interpreted ''with a view to effect its objects and to promote justice'' (Pen. Code, § 4), and the

anomaly that would otherwise result, we conclude that the words "offense" and "degrees" in section 1097 refer to all the degrees of criminality involved in a criminal act.

Even if we were to conclude, however, that section 1097 refers only to specifically defined degrees of single offenses divided into degrees, it would not follow that the instruction is erroneous. █ In every case the principle of reasonable doubt requires an acquittal of an offense when the prosecution has not met its burden of proof. █ Thus, whether reasonable doubt exists as between degrees of the same offense or as between the inclusive and included offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt. Narrowly construed, section 1097 at most illustrates the application of the rule in the case of crimes divided into degrees. It does not abrogate its application in other situations. (See *Southern Calif. Gas Co.* v. *City of Los Angeles,* 50 Cal.2d 713, 719-720 [329 P.2d 289] ; *City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 77 [142 P.2d 289] ; *Strand Improvement Co.* v. *City of Long Beach,* 173 Cal. 765, 772-773 [161 P. 975].) Accordingly, under either interpretation, it affords no basis for departing from the settled law. (*People* v. *Iams, supra,* 57 Cal. 115, 121, 130 ; *People* v. *Newcomer, supra,* 118 Cal. 263, 270-271; *People* v. *Marshall, supra,* 120 Cal. 70, 70-71; *People* v. *Burns, supra,* 88 Cal.App.2d 867, 871-873 ; see also *McAffee* v. *United States, supra,* 105 F.2d 21, 31; *People* v. *Marquis, supra,* 153 Cal. App.2d 553, 556-558; *People* v. *Miller, supra,* 67 Cal.App. 674, 678-679; 20 A.L.R. 1258, 1259; 26 Am.Jur., Homicide, § 541.)

█ The People contend, however, that the proposed instruction is erroneous in its statement of the rule of reasonable doubt between second degree murder and manslaughter. They object to the language that if you "entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense." They point out that it is only murder that is divided into degrees and contend that the jury would relate "degree of the crime" to degrees of murder, "lesser offense" to manslaughter, and conclude that under the proposed instruction doubt as to the degree of murder would require a verdict of manslaughter. The instruction cannot reasonably be construed to reach such an obviously absurd result. When read in context it is obvious that "degree of the crime" refers, not to degrees of murder alone, but to degrees of criminal homicide including

manslaughter, and that "lesser offense" refers to the lesser of the two degrees of criminal homicide between which the doubt exists. It thus makes clear that the principle of reasonable doubt applies not only between first and second degree murder but also between second degree murder and manslaughter.

The failure of the trial court to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of guilt of the lesser offense applied only as between first and second degree murder. This case was a close one on its facts. While there was sufficient evidence to support a conviction of second degree murder, a finding that the offense was manslaughter would be equally warranted. Even if the jury disbelieved defendant's testimony that he did not intend to hit Glover and concluded that the crime was not involuntary manslaughter, it was still presented with substantial evidence of provocation, much of which was undisputed, that would support a finding of voluntary manslaughter. (See *People* v. *Keel*, 91 Cal.App. 599, 604-606 [267 P. 161].) Glover had taken defendant's money and only returned part of it, passing the rest to his wife. Defendant could reasonably conclude that Glover intended to steal his money, and he testified that Glover made a menacing gesture toward him and told him that if he did not shut up he would lose more than his money. Defendant was entitled to have this evidence considered in the light of the rule of reasonable doubt, not only on the issue of self-defense, but also on the issue of provocation sufficient to reduce the killing from second degree murder to manslaughter. The record demonstrates that the jury considered the distinction between these offenses crucial and had difficulty with it. Six hours after the case was submitted to them, they returned to the courtroom and requested "once again the legal interpretation of murder in the second degree and voluntary manslaughter," and again the defendant requested that his instruction be given, and again his request was denied.

The proposed instruction should have been given. It went directly to the defense of reasonable doubt of defendant's guilt of second degree murder; it was clearly responsive to an issue raised by the evidence (*People* v. *Carmine*, 41 Cal.2d 384, 389-390 [260 P.2d 16] ; *People* v. *Hudson*, 45 Cal.2d 121, 126

[287 P.2d 497]) ; and it was essential to cure the misleading effect of its absence in the light of the other instructions given. Under these circumstances there exists "such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result," and accordingly the error is prejudicial. (*People* v. *Watson*, 46 Cal.2d 818, 837 [299 P.2d 243].) The error did not, however, have any bearing on defendant's conviction of violating Penal Code, section 12021.

The judgment and the order denying a new trial are reversed as to count one charging murder. In all other respects they are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Schauer, J., and Spence, J., concurred.

McCOMB, Concurring and Dissenting.—I would affirm the judgment for the reasons stated by Mr. Presiding Justice Kaufman in the opinion prepared by him for the District Court of Appeal in *People* v. *Dewberry* (Cal.App.), 327 P. 2d 616.

[Sac. No. 6914. In Bank. Feb. 10, 1959.]

GEDDES & SMITH, INC. (a Corporation), Appellant, v. SAINT PAUL MERCURY INDEMNITY COMPANY (a Corporation), Respondent.

560

Riggins, Rossi & Kongsgaard and Clarence N. Riggins for Appellant.

Desmond, McLaughlin & Russell and Jerome M. McLaughlin for Respondent.

TRAYNOR, J.—Plaintiff appeals from a judgment for defendant in an action to recover on an insurance policy issued by defendant to California Aluminum Products, Inc., hereinafter referred to as Aluminum Products.

Plaintiff, a building contractor, ordered 760 aluminum doors, door jambs, and attached hardware from Aluminum Products in November, 1950. The doors were to be used in 76 houses being constructed by plaintiff in the cities of Napa and Fairfield. The deliveries of the doors occurred from December, 1950, to February, 1951. The doors were kept in storage for some time, and plaintiff began to install them in May, 1951, and installed all of them within a few months. After installation, defects appeared in some of the doors within a few days and in others after various periods of time ranging up to six months. Some of the doors sagged on their hinges and dragged on the floors. Some went out of shape. Parts of some of the doors fell out. Some doors could not be closed and others that were closed became locked in place and could not be opened. Plaintiff notified Aluminum Products, which undertook to supply other doors. Many of the new doors had the same defects as the old. Some were found

damaged when received by plaintiff. Some could not be used because they were unsuitable; for example, 22 doors shipped as replacement-bathroom doors were equipped with chimes and letter drops. Aluminum Products shipped a total of 2,604 doors before enough suitable doors were obtained, and plaintiff was engaged in handling, storing, repairing, removing and installing doors for over a year.