Filed 5/29/13  P. v. Brazier CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055582 |
| v. | (Super.Ct.No. SWF10002413) |
| KEVIN DEON BRAZIER, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Albert J. Wojcik, Judge.

Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and

Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Michael Pulos,

Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Kevin Brazier, of attempted murder, which was premeditated and deliberate (Pen. Code, §§ 664/187, subd. (a)),[1] and making criminal threats (§ 422), during both of which he used a knife (§ 12022, subd. (b)(1)), and assault with a deadly weapon (§ 245, subd. (a)(1)). In bifurcated proceedings, the court found true allegations that he had suffered a serious prior conviction (§ 667, subd. (a)) and a strike prior (§ 667, subds. (c) & (e)(1)). He was sentenced to prison for 14 years to life plus 6 years.

## FACTS

According to her 911 call and an interview with a female police officer the day of the crimes, Mechelle said that she and the victim were boyfriend and girlfriend and shared an apartment into which they had moved on November 2, 2010. Mechelle had placed sticks in all the windows of the apartment because defendant, her ex-boyfriend, had "followed her" to the apartment when she moved and then had told her that he was going to break in and kill everyone. On November 18, 2010, when Mechelle went to the local Wal-Mart, behind which defendant "lived," defendant followed her around the store so she would not talk to another man, then, in the parking lot, removed the ignition key from her car and told her she could not go anywhere because he "'kn[ew she] was with [the victim].[2]'" On either this or another occasion, defendant got on the back of her car at Wal-Mart and held on while she drove because she would not let him in her car. He

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] We have redacted the victim's statement so as to not include the horrendously offensive racial word defendant used to describe the victim.

2

finally hopped off the car. On still another occasion, defendant slapped Mechelle's brother because she was going somewhere with him instead of being with defendant, then defendant returned to the apartment at 2:00 or 4:00 a.m. and banged on the window and threatened to kick down the door if he was not let inside. Defendant had also entered the apartment while no one was there on at least one occasion.

On November 26, 2010, defendant entered the apartment through the bedroom window and threatened to kill everyone there. Mechelle and the victim were naked, sleeping on the living room floor. Mechelle told defendant she wanted nothing to do with him, but he replied that "it" was not over until he died. Defendant had Mechelle's steak knife[3] and defendant said he was going to murder the victim,[4] if she didn't get up and talk to him. She did not get up. Defendant said he did not care—that he had nothing to lose. Defendant got on top of the victim, on the floor and stabbed the victim two to three times, saying, "I'm going to kill you, [victim's first name], for sleeping with my girl . . . ." Mechelle held onto defendant's hand so he would not kill the victim and she punched him and told him to let go of the knife. Defendant bit her on the arm.

At trial, Mechelle testified that *defendant* had been her boyfriend for over three years and the victim was her platonic apartment mate. More of her trial testimony will be described later in this opinion.

---

[3] She said that she kept it because she felt threatened by defendant.

[4] See footnote two, *ante*, page two.

The victim was interviewed by the police the day of the crimes. During the interview, which was played for the jury at trial, he said that he and Mechelle, his girlfriend, had lived together in the apartment since November 2. He recounted several prior incidents involving defendant, as well as the crimes. The first prior incident was in June or July 2010, during which he borrowed Mechelle's phone and called her and defendant answered the call. Defendant told the victim that Mechelle was defendant's girlfriend now and she was not with the victim. The two men argued. Eight days before the crimes, defendant and the victim got in an altercation in the living room of the apartment, then a physical fight in the driveway. The victim told Mechelle that defendant was no longer welcome in the apartment. The victim added facts to those contained in Mechelle's statement about the incident in which defendant jumped on the trunk of Mechelle's car by saying that it occurred within a couple of days of the crimes and the victim called her during it and he advised her to drive past the police station, but defendant jumped off before that. Just before the crimes, the victim told defendant that defendant could use the shower in the apartment. Defendant then tried to get the victim to leave the apartment so defendant could be with Mechelle. Defendant showed the victim a letter in which defendant said that he was going to be with Mechelle, and then defendant left. The victim said that before the crimes defendant had threatened to murder him. While defendant claimed to be in a relationship with Mechelle, she told the victim that she associated with defendant just to get money from him. The victim said that on the day of the crimes, he and Michelle were sleeping on the living room floor when defendant entered the apartment through the bedroom window. The victim felt a poke on

4

his thigh and awoke to defendant holding a knife to his throat and saying, "'I don't got nothing to do; I don't got nothing to lose. You're a dead man. It told you I was gonna get you. I told you I was coming back to get you. And you're sleeping with my girl . . . . And I told you it was 'till death do us part.'" Defendant said that he would be with Mechelle until death did them part. The victim grabbed defendant and held him down and told Mechelle to call the police.

At trial, the victim testified that he did not want to take the stand and he was Mechelle's apartment-mate at the time of the crimes—that he slept in the living room while she slept in the bedroom, although it was "typical" for them to both sleep in the living room. He testified he awoke on the morning of the crimes and the police arrived and dragged him outside. He denied seeing defendant in the apartment that day and claimed he did not know who called 911. He claimed he was drunk at the time of the crimes and while being questioned by the police at the hospital thereafter. He could not recall what he told the police or denied making statements in the recorded conversation and he could not remember how he got cuts on his neck, chest and side, other than they were scratches that could have resulted from lifting furniture.[5] He said he left the apartment for work Monday through Friday between 5:00 and 6:00 a.m. and returned between 9:30 and 10:00 p.m. He also said that defendant and Mechelle were in a "dating

---

[5] After the victim testified to this, the prosecutor was permitted to examine him as a hostile witness. (Evid. Code, § 776.)

5

relationship," but he and Mechelle had never been together. He testified that during the preliminary hearing, he claimed he did not remember anything about the crimes.

An apartment maintenance worker at the apartment complex testified that he was one hundred percent certain that he saw defendant looking into the apartment window around 7:00 a.m. the day of the crimes.

A recording of the 911 call made at the time of the crimes was played for the jury. On it, Mechelle is heard saying, "[Defendant's first name], give me the knife." The victim said, "This son of a bitch came through my window."

The officer who responded to Mechelle's 911 call at 7:34 a.m. on the day of the crimes testified that when he arrived outside the apartment, a scared and agitated male voice inside said to kick the locked door down.[6] When the officer entered the living room, he saw defendant lying on his stomach with his hands extended up over his head and a knife in one. The naked bleeding victim was on top of defendant with his stomach to defendant's back and his hands pinning defendant's hands to the floor. At the officer's direction, defendant let go of the knife and the victim moved it away from defendant's reach. Defendant hesitated when told to walk outside. The victim told the officer that he was the victim and defendant did not dispute this. The victim told the officer that he was afraid because defendant would have killed him in his sleep. The victim had one centimeter stab wounds to his left neck, chest and to the left side of his stomach. The

---

[6] Mechelle testified at trial that defendant said this.

6

officer testified that the victim did not appear to be intoxicated at the time he interviewed him at the hospital.

Another police officer who arrived at the apartment at 7:45 a.m. testified that a backpack containing defendant's social security card, other pieces of identification and a letter, purportedly written by Mechelle, using defendant's last name as her own, was found outside the window of the apartment. There was a piece of wood under the backpack and the screen was not present on the window.

The case agent testified that the window was to the apartment bedroom and there was a screen on the ground that fit that window.

A third police officer testified that the bedroom window of the apartment was open and a leg from the dresser was on the ground outside it.

Defendant's fingerprint was found on the window.

## ISSUES AND DISCUSSION

1. *Incompetency of Trial Counsel*

The only evidence adduced at trial that came anywhere close to supporting the theory that the attempted killing of the victim was the result of heat of passion or provocation was the testimony of Mechelle, who stated, on cross-examination, that when she awoke at 10:00 or 11:00 a.m. the morning of the crimes, defendant was in the hallway of the apartment.[7] Defendant told her to come to him, she did and they argued,

_____

[7] She also testified that defendant had permission from her to let himself into the apartment through the bedroom window, which she left ajar on such occasions, when she

*[footnote continued on next page]*

while the victim slept on the living room floor. The victim awoke 15 to 20 minutes later, and he and defendant began arguing. Mechelle assumed it was over her. The argument never ended. Defendant slapped the victim and the victim said he was going to call his homies. At some point, a physical fight erupted between the two and she told both of them to shut up because she had just moved into the apartment a few weeks before. She saw the victim get from the corner of the living room a knife which she used for cutting food and also kept in the bedroom for protection. Defendant asked the victim if the victim was going to stab him with the knife. The two began struggling over the knife and they wound up on the floor as they continued to struggle. She called 911 when she saw blood.

The jury was instructed that if defendant attempted to kill the victim while acting under the influence of a sudden quarrel or heat of passion, he was guilty of attempted voluntary manslaughter. However, "the provocation [had to] be of the character and degree as naturally would excite and arouse the passion . . . ." The heat of passion had to be such as would naturally be aroused in the mind of an ordinarily reasonable person in the same circumstances. Defendant could not set up his own standard of conduct unless the facts and circumstances confronting him were such as would have aroused the passion of an ordinarily reasonable person facing the same situation. The question was whether at the time of the attempted murder, defendant's reason was so obscured or

*[footnote continued from previous page]*
was not home and when he did this, he called her and let her know he was inside the apartment.

disturbed by passion as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than judgment. Provocation not sufficient to arouse passion, or provocation that was remote, so that sufficient time elapsed between it and the attempted murder for passion to subside and reason to return, did not reduce the crime to attempted voluntary manslaughter.

The jury was given the following instruction on the special finding that the attempted murder was willful, premeditated and deliberate, "'Willful' means intentional. [¶] 'Deliberate' relates to how a person thinks and means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] 'Premeditated' relates to when a person thinks and means considered beforehand. [¶] A person premeditates by deliberating before taking action. [¶] If you find that the attempted murder was preceded and accompanied by a clear, deliberate intent to kill which was the result of deliberation and premeditation so that it must have been formed upon pre-existing reflection and *not under a sudden heat of passion* or other condition *precluding the idea of deliberation*, it is attempt to commit willful, deliberate and premeditated murder. [¶] The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. [¶] The true test is not the duration of time but, rather, the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period

9

of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation. [¶] To constitute willful, deliberate, and premeditated attempted murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true."

The jury was not given the following instruction, "When the evidence shows that the defendant acted upon provocation of heat of passion and that this played a part in inducing the attempted killing, but also shows that such provocation was not such as to reduce the attempted murder to attempted voluntary manslaughter, you may consider the evidence of provocation for such bearing as it may have on the question of whether the attempted murder was committed with deliberation and premeditation." (CALJIC No. 8.73.)[8]

Under the instruction given, in order to conclude that the attempted murder was premeditated and deliberate, the jury had to find that defendant "careful[ly] thought" and "weigh[ed] the considerations for and against" it.[9] These concepts were specifically tied

---

[8] This is a copy of CALJIC No. 8.73. Of course, CALJIC instructions have not been used for a number of years. The closest Judicial Council of California Criminal Jury Instruction is CALCRIM No. 522, which addressed the effect of provocation on the degree of murder.

[9] The People assert that defense counsel below did not request an instruction on attempted voluntary manslaughter as a result of heat of passion or provocation, but the

*[footnote continued on next page]*

to the notion of heat of passion by the same instruction in its provision (italicized above) contrasting it, or "other conditions precluding the idea of deliberation" with pre-existing reflection. Finally, the instruction given provided that if the jury entertained a reasonable doubt about the existence of premeditation and deliberation, it was to make a not true finding as to the allegation. In short, the instruction given did not *in precise words* tell the jury to consider heat of passion/provocation in deciding whether defendant deliberated and premeditated, but stated that heat of passion precluded the idea of deliberation and was in contrast to pre-existing reflection.

Because the omitted instruction is a pinpoint instruction and must be given only upon request (*People v. Rogers* (2006) 39 Cal.4th 826, 877, 878), defendant here claims that his trial counsel was ineffective for failing to request it. In order to prevail, however, defendant carries the heavy burden of showing that had this jury been given the omitted instruction, there is a reasonable probability it would not have found the attempted murder to have been deliberate and premeditated. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 693.) We concluded that defendant cannot carry this burden because of the instruction that *was* given, as stated above, because the evidence on which such a finding could have been based was so weak and because the defense presented to the jury during argument was inconsistent with heat of passion or provocation.

---

*[footnote continued from previous page]*
prosecutor "mentioned" it and it was given. In fact, the prosecutor asserted that there was insufficient evidence to support heat of passion; therefore, an instruction on attempted voluntary manslaughter should not be given. When the trial court called to the attention of defense counsel the instruction on attempted voluntary manslaughter, counsel requested that it be given.

11

When Mechelle took the stand and was questioned by the prosecutor, she repeatedly asserted that she had no memory of what happened between defendant and the victim on the day of the crimes, how blood got on a blanket in the living room or talking to police officers.[10] She testified she could not recall or she denied making statements to the police, recordings of which were played for the jury. Those statements are that defendant came through the window and threatened to kill everyone in the house; that defendant said it was not over until he dies; that she said she had the windows stuffed with sticks because defendant said he was going to break in and kill everyone in the house; that she said she felt someone tapping on her leg and she looked up and defendant had the steak knife; that defendant said if she didn't get up, he was going to "murk (meaning, to murder) this [derogatory term defendant used for the victim]";[11] that defendant said "he don't care, he doesn't have anything to lose," then defendant got on top of the victim and stabbed him; that she said if she had let go of defendant's hand, the victim would be dead; that she said she had scissors, a knife and a sword under her bed because she was afraid of defendant; that defendant said, "You ain't going nowhere because I know you're with that [derrogatory term defendant used for the victim]";[12] that she said defendant bit her on her right arm while she was preventing him from stabbing

_____

[10] As a result of her lack of memory, the prosecutor, who had called her as a witness, was able to question her as a hostile witness. (Evid. Code, § 776.)

[11] See footnote two, *ante*, page two.

[12] See footnote two, *ante*, page two.

the victim; that defendant said, "I'm gonna murder this [derogatory term defendant used for the victim] [13] because he says he's staying with you"; that defendant said, "I'm gonna kill you, [victim's first name], for sleeping with my girl"; that she said that during the past week she had called police on defendant because he took her keys against her will; that she said defendant took her keys, killed her ignition and told her she couldn't go anywhere; that she said defendant was on the back of her car holding on and she was driving away and he wouldn't let go, and concerning defendant's threats to kill the victim, she said, "I guess [the day defendant committed the crimes] was that day." As stated before, she also testified that defendant had been her boyfriend for two or three years and that she had not been romantically involved with the victim, which was contrary to the statements she made in her 911 call and her interview with a female police officer the day of the crimes. She also testified that she went to sleep in the living room wearing boy shorts and a sports bra, yet she had told the female officer that during her 911 call, she was trying to put clothes on, she indicated during the 911 call that she was in the state of dress she was in because she had been having sex and the officer who arrived at the apartment in response to that call testified that she was naked when he got there. She testified that she did not remember being awoken by defendant, or defendant threatening to kill everyone in the house or that her windows were held closed by sticks because defendant had said he was going to break in and kill everyone, yet she told the female police officer these things. She denied telling defendant she was going to use

---

**13** See footnote two, *ante*, page two.

reverse psychology at the preliminary hearing when she testified and that he told her to claim she had no recollection at that hearing. However, a tape of a conversation she had with defendant before the preliminary hearing was held was played for the jury and on it, defendant told her to tell parole that she knew nothing, and she responded that she did what he had told her to do and used reverse psychology and claimed she had no recollection. Defendant told her to do the same during the preliminary hearing. She denied telling defendant that the victim had moved out of her apartment because he was scared and defendant told her to tell the victim to say that he and defendant had engaged in mutual combat. However, during the above-mentioned recorded phone call between her and defendant, she told defendant that the victim told her that he was scared to continue living in the apartment. During the same call, defendant told her that the victim should say that it was mutual combat—that they were fighting—and she responded that it was a love triangle. She testified that she had a scratch on her arm after November 26, 2010 from wrestling with the victim, who "had her down." However, as already stated, she told the female police officer that defendant bit her when she punched him so he would let go of the knife. She denied during her testimony preventing defendant from stabbing the victim. However, as already stated, she told the female police officer that she held onto defendant's hand so he wouldn't kill the victim. She testified she did not remember calling 911 on the day of the crimes. When confronted with the playing of the taped call, she admitted calling 911, but she back-pedaled from a statement she made during the call. When reminded of her statement during the call that she had seen defendant stab the victim in the neck, she suddenly remembered that both men had had

14

the knife. She also then remembered that the victim was on top of her and defendant and the victim were fighting over the knife.

She testified that she did not want to be a witness, that during the year preceding the trial, she called defendant every chance she had,[14] she visited him, she exchanged letters with him, he sent her mail using his last name for her as though it were hers, she has been in love with him since the third month of their courtship, she wanted to marry him, she wanted to spend her life with him after the trial, and during the previous year, she had attempted to marry him.[15]

On cross-examination by the defense counsel she was suddenly able to remember a good deal more. She testified that the knife she kept in her apartment was the knife over which defendant and the victim had struggled. She remembered trying to get the knife, including the position she was in while doing so, withdrawing from the struggle over the knife and defendant and the victim continuing to struggle until she saw blood. She remembered the facts stated above which served as the only arguable basis for a finding of heat of passion or provocation. She remembered that it was defendant who called out to the arriving police to kick in the door in order to gain entry to the apartment. She could not explain why in the 911 call she had referred to the victim as her boyfriend, even though she was in a dating relationship with defendant at the time. She remembered

[14] On cross-examination, she said she spoke to him maybe four times a week.

[15] During the pre-preliminary hearing recorded phone call between defendant and Mechelle that was played for the jury, defendant told her to go to the law library and ask for paperwork for a proxy marriage for herself, because the law library at county jail would not help him get the paperwork.

15

talking to a male deputy the day of the crimes. She continued to deny or claimed not to remember making certain statements that were in her 911 call and in her interview with the female police officer the day of the crimes: i.e., defendant harassing her, defendant breaking into the apartment, defendant saying he was going to murk the victim, putting things in her windows, defendant saying he was going to kill the victim and defendant stabbing the victim

During her redirect examination, the prosecutor called attention to the fact that she was able to remember a great many more things about the crimes during cross-examination by defense counsel than she was during his examination of her. She also admitted that during the preliminary hearing, which had occurred five weeks after the crimes, she testified that she did not remember anything about the crimes.[16]

In short, the testimony of Mechelle, which provided the only basis for a finding that defendant had attempted to kill the victim in heat of passion or as a result of provocation, was heavily impeached by her prior inconsistent statements and her obvious bias in favor of defendant, as well as the victim's prior statements and other trial testimony as set forth above which contradicted her trial testimony.

Additionally, as defendant here concedes, his defense was "primarily and only" self-defense, not heat of passion or provocation reducing the attempted murder to

---

[16] On recross-examination, Mechelle testified that she had lied to either the male Riverside County deputy sheriff who testified at trial or to "the male deputy" who questioned her on the day of the crimes and she had done this because of her children. However, no such interview was introduced into evidence or testified to by anyone. Instead, the female deputy who questioned her testified to statements Mechelle made and the tape of that interview was played for the jury.

attempted voluntary manslaughter.  In fact, defense counsel specifically asserted that the victim got accidentally cut while he and defendant struggled over the knife.[17]

Given this,[18] the weakness of the evidence supporting heat of passion or provocation, and the fact that the instruction given the jury on premeditation and deliberation provided that heat of passion precluded the idea of deliberation and was in contrast to pre-existing reflection, defendant has not carried his burden of showing a reasonable probability that had the omitted instruction been requested, and given, there is a reasonable probability that he would have enjoyed a better outcome.

We cannot agree with defendant that the jury's acquittal of the charged burglary necessarily meant that it did not believe that defendant premeditated and deliberated the attempted killing.  It is entirely possible for the jury to have entertained a reasonable doubt that defendant entered the apartment on November 26 with the intent to commit a felony and still have found that he premeditated and deliberated before attempting to kill the victim.  (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294,

---

[17] Defendant's attempt to recast his trial counsel's argument to the jury to support his current position is meritless.  Although counsel below asserted that defendant entered the apartment, as was his habit according to Mechelle's trial testimony, and was surprised to find Mechelle and the victim naked on the living room floor, counsel never asserted that this provoked defendant into attempting to kill the victim.  Rather, he argued that a fight ensued between the two men, during which the victim pulled a knife on defendant, and defendant successfully relieved the victim of the knife, during which the victim was accidentally stabbed.

[18] We also agree with the People that given defendant's tactical decision to mount this defense, he cannot demonstrate that the decision not to request the omitted instruction was not also a tactical one, and, therefore, did not amount to incompetency. (See *People v. Zapien* (1993) 4 Cal.4th 929, 980.)

["Premeditation and deliberation . . . can occur in a brief interval; . . . """"thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""""  [Citation.]"].)

2. *Failure to Instruct on Reasonable Doubt as to Whether Greater or Lesser Offense*

As already stated, the jury was instructed as to the charged attempted murder and the lesser offense of attempted voluntary manslaughter.  The jury was also instructed, as is pertinent here, according to CALJIC No. 17.10, "If you are not satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged, you may nevertheless convict [him] of any lesser crime, if you are convinced beyond a reasonable doubt that the defendant is guilty of the lesser crime.  [¶]  . . . The crime of attempted voluntary manslaughter, a violation of Penal Code section 664/192(a), is lesser to that of attempted murder, a violation of Penal Code section 664/187(a) charged in count 1.  [¶]  . . . [¶] Thus, you are to determine whether [the] defendant] [is] guilty or not guilty of the crime[s] charged or of any lesser crime[s].  In doing so, you have discretion to choose the order in which you evaluate each crime and consider the evidence pertaining to it.  You may find it productive to consider and reach a tentative conclusion on all charges and lesser crimes before reaching any final verdict[s].  However, the court cannot accept a guilty verdict on a lesser crime unless you have unanimously found the defendant not guilty of the [charged] crime."  Finally, the jury was instructed, according to CALJIC No. 2.90, "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] guilt is satisfactorily shown, [he] is entitled to a verdict of not guilty.  This presumption places upon the People the burden

18

of proving [him] guilty beyond a reasonable doubt.  [¶]  Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt, [it] is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.”

*People v. Dewberry* (1959) 51 Cal.2d 548, 555, held that where the evidence is sufficient to support a finding of guilt of a charged offense and a lesser included offense, if the jury has a reasonable doubt which crime the defendant committed, it must give the defendant the benefit of the doubt and find him guilty of the lesser included crime.  Penal Code section 1097 provides, in pertinent part, “When it appears that the defendant has committed a[n] . . . offense, . . . and there is reasonable ground of doubt in which of two or more degrees of the crime . . . he is guilty, he can be convicted of the lowest of such degrees only.”  The *Dewberry* court said of section 1097, “[The s]ection . . . presupposes that the jury has concluded that the defendant is guilty of some . . . offense embraced within the pleadings but is in doubt as to the degree of the offense proved.  . . .  [T]he words ‘offense’ and ‘degrees’ [in section 1097] . . . refer to all the degrees of criminality . . . involved in a criminal act. . . .  [¶]  . . .  [W]hether reasonable doubt exists as between degrees of the same offenses or as between the inclusive and included offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt.”  (*Id*. at pp. 555-556.)  Defendant contends that the failure to give an

instruction based on section 1097 and *Dewberry* requires reversal of his convictions.  We disagree.

Both section 1097 and *Dewberry* are based on the principle that the prosecution must prove a defendant guilty beyond a reasonable doubt.  (*Dewberry*, *supra*, 51 Cal.2d at p. 556.)  As explained in *Dewberry*: "In every case the principle of reasonable doubt requires an acquittal of an offense when the prosecution has not met its burden of proof.  Thus, whether reasonable doubt exists as between degrees of the same offense [as section 1097, narrowly construed, speaks to] or as between the inclusive and included offense, the jury can only convict of the crime whose elements have been proved beyond a reasonable doubt."  (*Ibid*.)

CALJIC No. 17.10, together with CALJIC No. 2.09, instructed the jury on the principle of reasonable doubt and the *Dewberry* principle, which specifically applies the principle of reasonable doubt when the jury has such a doubt whether the elements of a greater offense or a lesser included offense have been proved beyond such a doubt.

CALJIC No. 17.10 reflects and incorporates the principle of reasonable doubt as set forth in CALJIC No. 2.90, and its specific application in the *Dewberry* principle, because it tells the jury that it cannot find a defendant guilty of a greater crime unless all the jurors agree the defendant is guilty of the greater crime beyond a reasonable doubt.  Thus here, CALJIC Nos. 17.10 and 2.90 did not permit the jury to find defendant guilty of attempted murder, and required it to acquit defendant of that offense, in the event the jurors did not agree or at least some of them had a reasonable doubt whether the defendant was guilty of that offense.

20

In *People v. Crone* (1997) 54 Cal.App.4th 71, 76, this court noted that the giving of CALJIC No. 17.10 satisfied the requirements of *Dewberry*.[19]  In *People v. Barajas* (2004) 120 Cal.App.4th 787, 793, the appellate court held that the giving of CALJIC No. 2.90, along with CALJIC No. 17.10, was sufficient for the purpose of *Dewberry*. (Accord, *People v. Gonzales* (1983) 141 Cal.App.3d 786, 794, fn. 8; *People v. St. Germain* (1982) 138 Cal.App.3d 507, 521, 522.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

CODRINGTON
J.

---

**[19]** Defendant cites *Crone* for its statement of the standard for assessing the failure to give a required instruction, while ignoring this portion of our opinion.